QUINLAN v. PEW et al.

(Circuit Court of Appeals, First Circuit. June 1, 1893.)

No. 28.

1. SHIPPING—LIMITING LIABILITY—KNOWLEDGE OR PRIVITY.

The owners of a schooner chartered her at her home port orally for a fishing voyage to the master and crew. Before the voyage commenced, the bull's eye on one of the jib pennants was cracked, and had sharp edges that cut the sheet. The owners did not know of this, but the master did, and had time to inform the owners of the defect in season to have it remedied, but failed to do so. The master had been employed by the owners to put the vessel in condition. On the voyage the sheet parted, and one of the crew was injured thereby. *Held,* that the occurrence was without the "knowledge or privity" of her owners, within the meaning of Rev. St. § 4283; and, where such person injured has sued them for damages, they are entitled to proceed in admiralty for a limitation of their liability.

2. SAME—CHARTERERS AND OWNERS.

The right of the owners to proceed under this statute cannot be defeated because they had so let the vessel that the charterers became owners pro hac vice.

3. SAME—WARRANTY OF SEAWORTHINESS.

Nor can it be defeated on the ground that there was a contract, express or implied, on the part of the owners, that the vessel was seaworthy.

4. SAME—SINGLE CLAIM AGAINST VESSEL.

The right of the owners to a limitation of their liability in such case is not defeated by the fact that such claim for personal injuries was the only claim pending against the vessel. The Rosa, 53 Fed. Rep. 132, disapproved.

5. SAME.

Burden of proof under the statute.

6. SHIPPING—INJURY TO SEAMAN—DEFECT IN VESSEL — LIABILITY OF OWNERS —COCHARTERERS.

A member of a fishing crew, who is a cocharterer with the master of the fishing vessel, stands in no better position than the master in respect

to a defect in the vessel which is known to the master, and hence cannot recover against the owner for a personal injury resulting from such defect.

Appeal from the District Court of the United States for the District of Massachusetts.

In Admiralty. Petition by Charles H. Pew, John J. Pew, and John K. Dustin, Jr., copartners under the firm name of John Pew & Son, owners of the schooner Essex, for a limitation of liability in respect to an injury incurred on board the schooner by John Quinlan. There was a decree for petitioners in the court below, and said Quinlan appeals. Decree amended and affirmed.

The facts fully appear from the following opinion delivered below by Judge NELSON:

This is a petition under Rev. St. § 4283, and the act of June 19, 1886, (24 Stat. 79,) by the owners of the fishing schooner Essex, of Gloucester, to limit their liability for an injury to Patrick Quinlan, which occurred on board the vessel, and for which Quinlan has brought a suit against them in the circuit court of the United States for this district, claiming $10,000 damages. Appraisers in this court appraised the value of the vessel at $7,200. There was no freight pending. The petitioners contested their liability. From the report of the commissioner, appointed under the fifty-fifth admiralty rule, the following facts appeared:

The petitioners orally chartered the schooner for a fishing voyage to one John A. Thomas and others, of whom said Quinlan was one, Thomas being the master, on what is called a "quarter lay,"—an arrangement by which the owners furnish a vessel fully equipped for the voyage, and the master and crew furnish the labor, provisions, fishing tackle, bait, salt, and other things intended for consumption on the voyage; the proceeds of the fishing to be divided, one-quarter to the owners of the vessel, and three-quarters to the master and crew. In such cases the owners determine to what master they will intrust the vessel, whom the crew cannot change, and the master decides who may ship as crew, when and where the vessel shall go, when, where, and at what price the fish shall be sold, and at the end of each voyage he adjusts the accounts, and pays over one-quarter of the gross proceeds of the fish to the owners, (less some trifling charges,) and, after paying for the supplies above mentioned, divides the balance among the crew equally, including himself as one of the crew. The master, in addition to his share of the fish money, also receives from the owners a commission of 8 per cent. of their share of the proceeds, as compensation for looking after the vessel, and especially for seeing that the same and her appurtenances are not willfully or negligently injured by the crew, but he does not have any authority to procure repairs on the vessel on the owners' credit. The owners also reserve the right, in these agreements, to terminate the same and retake the possession of the vessel at any time, and at any place where she may be found, and also a right to one half of whatever the vessel may earn for towing or assisting vessels in distress. Before the commencement of the voyage on which Quinlan was injured, the bull's-eye at the end of the starboard jib's pennant had become cracked, and had sharp edges around the hole in the block, by which the jib sheet had become chafed and partly worn away. The owners had no knowledge of such fact, but the master was informed of the same before the vessel sailed, and in time to notify the owners, and to have the same repaired, or new ones substituted, had he desired so to do. For some days before sailing the vessel lay at the petitioners' wharf in Gloucester, and during that time the petitioners, or one of them, was on the wharf, or on the vessel, at or about the time the port jib sheet was renewed. When about 130 miles out on the fishing voyage, in a strong breeze, and when the starboard jib was drawing full, the master ordered Quinlan

to put on a preventer, to prevent the jib from being carried away, there having been no strain on the jib sheet during the voyage until a short time before the order. Quinlan had hooked one end of the preventer into the jib's pennant, and was about to fasten the other end to some part of the vessel, when the jib sheet suddenly parted where it was chafed, the sail blew out to leeward, carrying the preventer with it so rapidly and forcibly that it struck Quinlan's leg with so much force as to fracture it. Another jib sheet was immediately rove in with other rope then on board the vessel, but the bull's-eye was not changed until the vessel returned to port, it being the work of a blacksmith to put in another. Quinlan knew of the condition of the bull's-eye and sheet. The owners were bound to furnish a safe and suitable vessel and rigging for the voyage, including the block and jib sheet, and they fully intended so to do; but the same was not safe and suitable for this voyage, and the owners would have changed the same for new ones had they been so informed by the master, or otherwise; and they, in fact, did change the jib sheet on the port side of the vessel just before she sailed on the voyage in question.

Upon these facts there is no ground for holding the owners responsible for the accident. The direct and proximate cause of the accident was the negligence of the master in not sooner replacing the chafed jib sheet with a new one from the spare rope on board. It was his duty to attend to repairs of this nature on shipboard during the progress of the voyage at sea. No negligence on the part of the owners in respect to the defective bull's-eye and sheet appears. The case shows that they had no knowledge of the defects before the vessel left port, and that they were not guilty of any failure of duty in not discovering them, and that Thomas knew the condition of the bull's-eye and sheet, but did not report it to the owners. Quinlan also knew it. The case also finds that they would have remedied the defects if they had been reported to them. Assuming it to be the law that owners are liable to the crew for the negligence of the master of a vessel when run on their own account, yet this cannot possibly be the case when the master and crew are joint charterers. The relation of principal and agent between the owners and Thomas in respect to the navigation of the vessel did not exist, or, if it did, to some extent, Thomas was equally the agent of the crew, and the owners are no more responsible for his conduct than are the crew. It is claimed by Quinlan that the owners are liable under their implied warranty of the seaworthiness of the vessel. But the warranty cannot extend to a defect which was known to the charterers at the time of the letting, and when the vessel left port, and was not known to them. The contract was with the charterers jointly, and not severally, and the parties could not have contemplated that for a breach of it such damages as are claimed here should have been recoverable. The petitioners are entitled to a decree declaring them exempt from liability for the damages claimed by Quinlan, and for a perpetual injunction against the further prosecution of this suit at law.

After briefs had been filed in the circuit court of appeals, the court made the following order:

Ordered, that the above case be reargued on the following points: (1) What constitutes "privity or knowledge" of the owner, within the meaning of the statute, and do the facts in this case bring it within the statute? (2) Was the appellant a cocharterer? (3) If a cocharterer, is he chargeable with the master's knowledge of the condition of the dead-eye, and, if so, what legal consequences flow from such knowledge? (4) Does there exist an implied warranty of seaworthiness of the ship as between owner and mariner, whether mariner is a cocharterer or otherwise? (5) If such implied warranty of seaworthiness does exist, does it extend to such a defect as a chafed jib sheet and defective dead-eye, of the character found by the commissioner? (6) If such implied warranty does exist, how is it affected, if at all, by knowledge on the part of the master or mariner of the defective dead-eye? (7) If such implied warranty does not exist, and the appellant's right of recovery

is based upon want of ordinary care or negligence on the part of the owners, does a chafed jib sheet and defective dead-eye show such want of ordinary care or negligence as to entitle the appellant to recover, or is such defect to be regarded as merely incidental to the wear and tear of a voyage, although such defect existed before the ship sailed? (8) If the mariner's right of recovery is limited to tort, is the master's knowledge of the defect the knowledge of the mariner, in the sense that the mariner assumes the risk? (9) Would the assumption of risk by the mariner, owing. to the master's knowledge, or his own knowledge, of the defect, or contributory negligence on his part, bar his recovery, or only go to the reduction of damages?

Samuel J. Elder and William A. Pew, Jr., for appellant.
John Lowell, Jr., for appellees.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. The proceedings in the district court for limiting the liability of the owners of the vessel concerned in this case were based entirely on the claim of Patrick Quinlan, the appellant, who had brought a suit at common law against them for a personal injury alleged to have been caused by a defective dead-eye. While the statute touching this matter does not permit any court of common law to question the proceedings in the district court, the whole record is open to re-examination in this court in all particulars.

The appellant maintains that the case does not meet the requirement of the statute covered by the words "without the privity or knowledge of such owner or owners." If the owners are not entitled to limitation of liability as against Quinlan, then, inasmuch as the only claim appearing is his, and the proceedings in the district court rest exclusively on it, they must be reversed. We understand that the expressions in Butler v. Steamship Co., 130 U. S. 527, 552, 9 Sup. Ct. Rep. 612, are not inconsistent with this proposition, and that they merely hold that a district court has jurisdiction to entertain a cause of limited liability for the very purpose of examining whether or not the misfortune was without the privity or knowledge of the owners. It seems to us that, if the district court finds they are not entitled to the benefit of the statute, it has no power to bar the claimant from any portion of his demand, and, especially when there is no other apparent claim, the proceedings must be dismissed, to enable him to prosecute the owners in such tribunal as he may justly elect. This conclusion is recognized by admiralty rule 54, providing that owners claiming a limitation of liability may file a libel or petition setting forth the facts and circumstances on which such limitation is claimed. Although the rule does not specifically provide for maintaining the allegations of the petition, and passes at once to another subject-matter, yet it follows, as a matter of course, that what must be alleged must be proved. This is emphasized also in rule 56, repeating the language cited from rule 54, and providing in terms that the persons claiming damages may answer the libel

or petition, and contest the right of the owners, either to an exemption from liability or to a limitation, or both.

Touching the matter of "privity or knowledge," we are not shown that the precise question involved here has ever been settled by the supreme court. From the standpoint of the appellant, the cause of his injury was a structural defect, existing when the vessel sailed from her home port on a new voyage. The alleged defect would have been discovered on an extremely careful scrutiny of the vessel and her top hamper, although quite likely to be overlooked on an ordinary examination. It also appears that all the owners lived in the home port. The propositions of law which the appellant bases on these facts, are that under these circumstances the risk was on the owners to completely examine the vessel, and put her in order for sea, and that, failing this, they are chargeable with privity or knowledge,—not actual, but with that presumed privity or knowledge which for many purposes take the place of the actual. It will at once be seen that, in the eyes of the law, the conditions may be different from what they are in the cases ordinarily before the courts, wherein the injury comes from something supervening after the voyage has begun, or from something arising from an omission to properly repair or fit a ship between her arrival at, and departure from, a port where the owner does not reside. At such times it is not expected the owner will be personally present, and the law permits him to act through his agent, who, when the ship is at sea, is the master, or, when in a distant harbor, is either the master, or some other suitable person designated to perform the duties ordinarily incumbent on himself in a home port. It has been held that under some circumstances the owner may be liable to mariners for faults of the master at sea,—a proposition which we do not now find it necessary to consider; yet, even if he were, such liability would be limited by the statute, as was settled by the supreme court in the opinions which we will hereafter cite. It can hardly be doubted that, alike in the case of a ship at sea and in that of one in a distant port, the statute applies, provided the owner has used reasonable care in selecting his master, consignee, or other agent.

It is settled that the statute limiting liability applies to cases of personal injury. Butler v. Steamship Co., 130 U. S. 527, 9 Sup. Ct. Rep. 612, and Craig v. Insurance Co., 141 U. S. 638, 12 Sup. Ct. Rep. 97. It was also settled in those cases that the owner is not deprived of the benefit of the statute by reason of the privity or knowledge of the master. Also, in Providence & New York Steamship Co. v. Hill Manuf'g Co., 109 U. S. 578, 602, 3 Sup. Ct. Rep. 379, 617, attention is called to the distinction in the expressions used in the first and third sections of the original act of 1851, limiting liability of owners of vessels, in that the first section, in case of fire, relieves the owner only when he is free from "design or neglect." The opinion observes that when the owners may not be able, under the first section, to show absence of neglect, they may

be very confident of showing, under the third section, absence of privity or knowledge. Apparently the supreme court understood that privity or knowledge may be less than neglect, and that therefore it does not always follow that owners are chargeable with privity or knowledge, even if legally chargeable with the other. There is ground for maintaining from this expression that the owners in the case at bar might be entitled to the benefit of the statute, although they had been somewhat personally negligent with reference to fitting the vessel for sea; but we are not required to pass on this precise proposition.

The expressions found in the opinions of other courts are mainly dicta, and are in no event of sufficient authority to guide us, except only the conclusions in The Warkworth, 9 Prob. Div. 20, 145. It appears from the statement of this case (page 146) that the cause of injury was a structural defect, occurring through the negligence of persons on shore employed by the owners of the vessel to super-intend putting her machinery in order. Whether or not this was at the home port is not stated, but it appears (page 20) that there was a periodical inspection of the machinery every six months, which was presumably at that port. Certainly, neither the di-visional court nor the court of appeal deemed it necessary to dis-tinguish the case on that account. However, the various opinions in that suit, which are very high authority, establish the proposi-tion that owners may, under some circumstances, receive the bene-fit of the statute limitation as against the negligence of their agents to properly inspect the ship when in port, or to prepare her for sea, as they may for the negligence of the master in navigating her. Under the British statute (25 & 26 Vict. c. 63, § 54) it was necessary for the owners of this ship to meet two conditions in order to obtain the benefit of the limitation. One was that the defect was "without their actual fault or privity," and the other arose from the term "improper navigation." The former words, the probate division said, show an intention to relieve the ship-owner when damage has been caused by the fault of his servants, and he himself has not been in any way to blame. No notice was taken of this in the court of appeal, but there such was assumed to be the law, as the discussion in that court related entirely to the words "improper navigation," and the decision was in favor of the limitation. This case is summarized in Marsden's Collisions at Sea, (3d Ed., p. 172,) as follows:

"The effect of the words is to protect the shipowner, not only as against the legal consequences of negligence in his servants or agents, but also from any imperfections in his ship which cause collision."

That in the case at bar the owners had no knowledge of the ex-istence of the alleged defect is stated by the commissioner, and reaffirmed by the district court, and there are no facts in the record which will enable this court to find otherwise. Therefore this word drops out from our further consideration. The word "privity"

is evidently not used in the statute under consideration in any technical sense, especially in any of the technical senses of the common law. Therefore we find in the law dictionaries no definition of it which aids us in the pending case. The word "privy," which undoubtedly is the root of the common word "privity," is defined by Bouvier as follows: "Privy. One who is a partaker, or has any part or interest, in any action, matter, or thing." The ordinary sense of the word "partaker" implies activity; and, clearly, the owners in this case were not in that sense partakers in the cause of the appellant's misfortune. The remaining portions of Bouvier's definition are so general and indefinite as to require us to look further. The Century Dictionary, after giving several definitions of the word "privity" not pertinent here, contains the following: "(5) Private knowledge; joint knowledge with another of a private concern, which is often supposed to imply consent or concurrence." As illustrating this, the dictionary cites the following sentence: "This marriage brought upon Garcilasso, in consequence of his privity, the displeasure of the emperor." We believe this correctly expresses the meaning of the word as used in this statute. Webster's International Dictionary, among other definitions of this word, gives the following: "(2) Private knowledge; joint knowledge with another of a private concern; cognizance implying consent or concurrence,"—and illustrates by a quotation from Swift: "All the doors were laid open for his departure, not without the privity of the Prince of Orange." The basis of the word is said to be the French "privaute," which this dictionary makes the equivalent of extreme familiarity. Worcester's Dictionary is to the same effect. No one can read these definitions of privity without understanding that its ordinary use implies knowledge and something more, and in no event anything less. They convey the idea of a private or other special or particular knowledge, or of such cognizance as implies active consent or concurrence.

We therefore conclude that the word "privity," as found in this statute, includes at least as much as the word "knowledge;" but we of course do not overlook the fact that there is in law imputed knowledge, and therefore there may be imputed privity. Each of these arises where the owners give an order for the doing of a particular thing in a particular way, and assume that it is done, or do not inquire whether or not it is afterwards accomplished. Under such circumstances the word "privity" is even more pertinent than "knowledge," because, while the conduct of the owners would in law impute knowledge, they would also actively partake. Each is also imputed to those who refuse to see, or who are guilty of perverseness, or of such crass negligence as amounts to it.

We have seen that the supreme court holds that the owners are not chargeable as with privity or knowledge for the acts or defaults of a properly selected master, while the ship is at sea; and that, in the view of the courts of probate division and of appeal, they are not ordinarily so chargeable for the doings or omissions of an

agent in port,—certainly, at a port which is not the home of the owners. We are also constrained to the belief that this statute, which the supreme court directs shall be interpreted broadly, has regard for the usual necessities of the occupations of life, and in that respect intends that owners may avail themselves of the proper facilities common to business men, and be relieved, so far as it is concerned, whenever and so far as they have appointed a suitable representative, be he master, consignee, or other agent, to supervise the ship, either at sea or at the home port, or otherwise, and either for fitting her away, or navigating her after she is so fitted away. The law, for the purposes of this case, cannot make a distinction between the owner who has but one vessel, and time and opportunity to give it his personal attention, and the owner who has many vessels, or whose necessities call him long distances from his residence, or whose infirmities, sickness, inexperience, or sex renders him or her incapable of attention to affairs of this nature. Therefore we establish uniformity of application of the law, and fulfill the spirit of the expressions of the supreme court to which we have referred, when we hold that, even if the owner is chargeable under the statute with privity or knowledge, who permits a ship to sail from the home port without making provision for inspection or proper fitting away, yet he may rest his duty upon any suitable agent, and, when he has done this, he may be relieved under the statute, although the agent may be negligent in some particulars. Whether, where the owner undertakes personally to do this duty, he is to be charged for the lack of the extremest care possible, or takes the hazard of overlooking some things which the utmost scrutiny might discover, or whether, acting with ordinary good faith, he will be relieved, provided the defect in question did not come to his attention, we are not now required to determine.

The commissioner found that he was not able to report positively whether the owners in this case examined the vessel to ascertain what repairs were needed. It is not clear from this whether he had reference only to personal examination by the owners, or intended to include that by the master. There is enough here, however, to suggest a question of the burden of proof. While perhaps, in the admiralty courts, this question does not take the sharp form which it does at common law, still the underlying principles touching it are recognized; and as, in this case, the owners were obliged to allege, in order to maintain the privilege of limitation, that they were without privity or knowledge, and as this proposition is one peculiarly within their own cognizance, a certain burden rests on them. 1 Greenl. Ev. §§ 78–80, and 3 Greenl. Ev. § 404. It is true that the admiralty courts will administer this rule with large regard to the convenience of proof, as is apparent from passages in Butler v. Steamship Co., 130 U. S. 527, 554, 555, 9 Sup. Ct. Rep. 612, indicating presumptions in favor of the owners on various propositions touching this particular expression of the statute. Were

this a case of generally worn-out sails or top gear, the burden would plainly rest on the owners to show, by very strong evidence, that it was without their privity or knowledge; but relating, as it does, wholly to a matter very likely to escape attention on a fairly good inspection of the vessel, very slight evidence is sufficient at the outset to cover this negative allegation.

The case shows that the master received a compensation for looking after the vessel, and was aboard her long enough before she sailed to notice this defective dead-eye, and to have informed the owners of it in season for repair, had he desired so to do. The court below expressly finds that the owners were not guilty of any failure of duty in not discovering the defect, and had no knowledge of it; and the brief for the appellant in one place admits that the duty of supplying a vessel according to the contract was delegated to the master, and continues as follows:

"In so far as he represented the owners in looking after the vessel, and seeing that she was in proper condition before putting to sea, he acted in the capacity of vice principal, and was not a fellow servant of the appellant."

We cite this for the purpose of covering the fact in question, and not of rediscussing what the sentence claims with reference to the law. On this branch of the case we therefore hold that there is sufficient to meet the requirements of the statute, that the owners of the vessel were without privity or knowledge of the defect in question.

It is also claimed by the appellant that the statute does not apply, because, on the basis of the owners' position, they had let the vessel in such way that the charterers became the owners pro hac vice, and so only the latter could apply for its protection. A literal construction of the statute must give way to good sense. It would be at odds with its main purpose to exclude the general owners from the benefits of so useful a law. Notwithstanding the charter, the general owners may be liable to serious consequences, arising out of the charter itself and the implied warranty which it contains, and may need to be protected. It would be an unjust application of this statute to eject the owners from the admiralty courts on the ground that they had let the vessel, and allow a jury to charge them with personal liability on a finding that they had not. The provision on which the appellant relies is one of inclusion, and not of exclusion.

Neither can the proposition of the appellant be maintained, that the statute does not apply, because there was in this case a personal contract on the part of the owners, either express or in the form of an implied warranty, that the vessel was seaworthy. In nearly all the instances which the statute expressly enumerates as those to which the limitation of liability applies, there is necessarily an implied warranty, and frequently an express agreement in the form of a bill of lading; so that, if the contention of the complainant is correct, the wings of the statute would be effectually clipped.

That there may be certain contracts, relating not so much to the navigation of the ship as to fitting her for sea, by which the owners charge personally their own credit, and which do not come within the statute, may be well contended, without at all touching the principles here involved.

The appellant also objects that it appears from the proceedings that the claim of Quinlan is the only outstanding one against the vessel, or owners as owners, and that this fact brings the case within The Rosa, 53 Fed. Rep. 132, where it was held that the statute limiting liability does not apply under such circumstances. As already said, the state of the record is as claimed by the appellant; yet this court cannot accept the rule laid down in The Rosa. The statute right to surrender the vessel to a trustee appointed by any court of competent jurisdiction, which in maritime matters necessarily includes the admiralty courts, and to be thus relieved from liability, is protected both by the letter of the statute and by its reason, whether there are numerous claims outstanding or but one; and the right to have the vessel appraised under admiralty rule 54 is necessarily coextensive with the right to surrender. Indeed, under admiralty rule 56, the owners may bring the entire contest into the admiralty court, even though they finally establish a contention that there are no valid claims whatever. The rule in The Rosa is quite impracticable, as it is frequently impossible for the owners of vessels navigating foreign seas, remote from their personal control, to be assured as to the extent to which they may be subject to liens and claims of various kinds. The original act of 1851 (section 4) uses both the plural and singular; and there is no such change found in the Revised Statutes as would justify the court in holding that congress intended any substantial innovation. Indeed the Revised Statutes (section 4285) use both the plural, "claimants," and the singular, "person," thus bringing forward the plural and singular of the original act. The statute was intended for the encouragement of commerce, and would not receive its full effect, to the extent given by the supreme court in Providence & New York Steamship Co. v. Hill Manuf'g Co., 109 U. S. 578, 588, 589, 3 Sup. Ct. Rep. 379, 617, if the owner of a vessel or wreck, under the circumstance of there being but a single claim outstanding, large enough to absorb the entire vessel or her salvage, could be compelled, on the verdict of a jury, to pay perhaps vastly more than her real value, or be forced to the trouble and expense of litigating any issue of that character. The appellant treats the jurisdiction to be exercised under the statute as though governed exclusively by the principles applicable to courts of equity. But with these neither the statute nor the proceedings under it, so far as concerns the admiralty courts, have any relation, except merely incidentally, whenever it happens that the claims are in excess of the value of the vessel or her salvage. In that event the rules of equity procedure come in, not for the purpose of determining the jurisdiction

of the court, but only as they relate to proceedings in bankruptcy, or any other proceedings, when marshaling of assets becomes incidentally necessary.

Therefore we hold that the owners of this vessel are entitled to a decree limiting their liability, so that the district court had jurisdiction to adjudicate the merits of the appellant's claim. On this latter branch of the case, while perhaps it could be justly maintained that injuries arising to seamen under the exact circumstances of the case at bar are the ordinary incidents of the voyage, which the seaman assumes when he ships, and cannot form the basis of an action, yet, without discussing that proposition, or conceding that the decree of the district court might not be affirmed on that ground alone, we leave the case where the learned judge of that court left it.

The commissioner found that the vessel was under charter to the master and sharesmen, of whom the appellant, Quinlan, was one. The words used by the commissioner in this particular, "lease, let, or charter," were not merely formal, but were intended to cover an actual transaction, by which the charterers became the owners pro hac vice, as is clear from the fact that the commissioner afterwards said that the owners reserved the right "to retake possession of the vessel at any time."

It is possible, and indeed probable, that there are many things in the agreement between the owners and the master and sharesmen set out in detail by the commissioner, which would suggest that the commissioner might well have found otherwise than he did; but as his conclusions of fact were not challenged in the court below, nor in the only method in which they properly could be, they cannot be reviewed here. The defective dead-eye, of which complaint was made, was known to the captain before the vessel sailed, and in time to notify the owners in season to have had the same repaired; so that, as the captain voluntarily sailed under these circumstances, it is clear that he waived whatever rights he otherwise would have had, if any, on account of this defect. As the sharesmen were joint charterers with him, they were, at least so far as concerns the matter here involved, in no better position than he.

The appellant has cited many cases in which it was plainly the view of the courts that the sharesmen were not cocharterers; but by the findings of the commissioner this case is sui generis, and perhaps wholly exceptional. So, also, the discussion touching questions of partnership are not in point, as the relations of the sharesmen and the master were not of that character in any view of the case. The defect being in fact known to the master, it is not important whether the general obligations of the owners to mariners are governed by the rules of express warranty, implied warranty, or only reasonable care. Neither need we discuss propositions based on the claim that the master was negligent in ordering the appellant forward to put on the preventer, as there is no finding

to that effect by the commissioner, and the proofs laid before him are not in the record. And, in conclusion, the results reached by us render it unnecessary to consider whether the appellant had knowledge of the alleged defect, or should have had knowledge of it, or whether it constituted unseaworthiness, or to consider any other question which has been suggested.

The decree of the district court is to be amended by adding that petitioners, namely, the owners of the schooner Essex, and the said vessel and her proceeds, are forever exempt from any liability for or on account of the claim of said Patrick Quinlan, in every form of proceeding and in every jurisdiction, and that such claim is held invalid and is disallowed; and the decree, when thus amended, is affirmed, but without costs in either court for either party.

ALDRICH, District Judge, (concurring.) I concur in the result, but am not prepared to accept the reasoning of the learned circuit judge with respect to privity. I am inclined to think that the words "privity or knowledge," as used in the statute, may mean less than knowledge, and that the circumstances or nature of the defect might be such that the failure of the owner to inspect and make the vessel staunch and seaworthy before the commencement of the voyage, would render him privy to disasters which result directly therefrom; but I agree that there is nothing in the case under consideration to bring it within this query.