## SORENSON & NEILSON et al. v. BOSTON INS. CO.

(District Court, D. Maryland. January 21, 1925.)

No. 1315.

1. **Insurance ⬤⟳273—Implied warranty of seaworthiness in marine time policy to stated extent.**

Marine policy, considered as time policy merely, has implied warranty of seaworthiness to the extent, at least, that where ship, with privity of assured, due to privity and knowledge of its president and general manager, is sent out in unseaworthy state, insurer is released from loss attributable to unseaworthiness.

2. **Insurance ⬤⟳273—Marine liability policy vitiated by insured sending out ship with privity or knowledge of insufficiency.**

Insured in marine liability policy, by sending out ship with privity or knowledge of ship's insufficiency, substantially alters nature of contemplated risk, increases normal liability, and thereby vitiates policy.

In Admiralty. Libel by Sorenson & Neilson and another against the Boston Insurance Company. Libel dismissed.

Bigham, Englar & Jones, of New York City, and Janney, Ober, Slingluff & Williams, of Baltimore, Md., for libelants.

Lord & Whip, of Baltimore, Md., for respondent.

SOPER, District Judge. On July 6, 1923, a lighter, belonging to Graham & Co., Incorporated, undertook to transport certain bags of coffee received from the steamship Comac, then lying alongside the Western Maryland Railroad's pier, to the warehouse at Belt's Wharf, at the foot of Fells street, in the port of Baltimore. In so transporting the cargo, the lighter sank, solely by reason of unseaworthiness. Thereby the cargo was damaged. This libel is brought by the cargo owners against the Boston Insurance Company, which had issued its policy of insurance to Graham & Co., covering a period from March 22, 1923, to March 22, 1924, upon merchandise on board the company's lighters, including the lighter in question. The cargo owners bring suit under the provisions of sections 15 and 16 of the policy, which are as follows:

"(15) This insurance is to cover for account of the assured, as owners, common carriers, forwarders, bailees, custodians, or otherwise, and is also to cover on account of all such owner or owners of the property transported as may be after any loss, designated by the assured as having been intended by it to have been insured hereunder, such designation so made in any proof or proofs of loss to be conclusive on all parties hereunder, and the said assured are hereby recognized as agents and trustees for and in behalf of such owner or owners of the said property as may be designated for all purposes of this insurance, with authority to bring suit in their own name to recover loss or damage thereto, and without any right on the part of the insurer to set up any exemption of carrier from liability by reason of anything contained in their bills of lading or contracts of affreightment or otherwise.

"(16) It is, however, especially agreed that this policy is not intended to insure any parcel of merchandise of any of the lighters, barges, and/or scows owned or used by said assured, upon which the owner, owners, and/or shipper thereof have affected specific insurance, but in all such cases the insurance hereunder shall be limited to the property right of the assured therein, and to the earned freight and advanced charges due the assured and/or its connecting lines, and the legal liability of said assured for the loss of or damage to such merchandise, should any such liability exist, and, in the event of any loss or damage, this policy shall be forthwith reinstated, and continue to cover for its original amount, and an additional premium pro rata at the rate of this policy on the amount so reinstated shall be due this company for the unexpired term of this policy."

Graham & Co. was adjudicated a bankrupt in this court on September 28, 1923, and thereafter, on December 4, 1923, the president of the bankrupt company, purporting to act in accordance with clause 15 of the policy, designated the libelants in writing as having been intended by it to have been insured by it under the policy. Subsequently, on December 10, 1923, the trustee in bankruptcy, in conformity with an order of this court, made an additional designation to the same end.

The same accident was before this court in the cases of Sorenson & Neilson v. Belts Wharf Warehouse, Inc., Graham & Company, et al., and J. Aron & Co., Inc., v. Belts Wharf Warehouse, Inc., Graham & Co., et al., which were brought to recover damages for injury to the cargo. The trustee in bankruptcy declined to participate in the suits, but permitted the insurance company to conduct the bankrupt's defense. By the decree in each case (affirmed on appeal 9 F. [2d] 1021), it was determined that Graham & Co. was solely responsible for the accident, and

that the lighter was unseaworthy, to the privity and knowledge of William A. Roberts, the president and general manager of Graham & Co., which was therefore refused the right to limit its liability. The findings of the court in the opinion and decree as to the negligence of Graham & Co., and the privity and/or knowledge of its president, have been stipulated as conclusive in the case at bar.

It may be noted that there is some difference between the opinion and the decree. In the decree it is expressly set out that the lighter was unseaworthy to the privity *and* knowledge of Roberts, whereas in the opinion it is not expressly found that he had knowledge, although it was decided that he had privity, at least, of the condition of the vessel. It was held, in conformity with the rule laid down by Judge Waddill in Pocomoke Guano Co. v. Eastern Transportation Co. (C. C. A.) 285 F. 7, that the president and general manager was a person in authority, who represented the corporation in such a capacity as to speak for it, and it was therefore chargeable with his knowledge of the existence of defects, or became privy to his negligence. It was also determined that the unseaworthiness of the lighter was due to a leak. It had been lying light in the water for a period of 24 days in hot weather, whereby the seams were loosened, so that, after she was laden, she took water and sank. The seams closed after the boat had been submerged, so that, when she was finally raised, she was water-tight, without any repairs to make her so.

It was further found, from the testimony of Roberts himself, that it was his daily custom and duty to inspect all of the lighters, going down into the holds of the vessels, and walking through from end to end. On this occasion he was on the lighter within five minutes of the time that she left the ship. It was discovered, after the barge was loaded, that water was coming in at a certain point, and the lighterman on board, with the assistance of another lighterman of Graham & Co., endeavored to stop the leak; but no investigation was made of another part of the hold, at which water came in very fast after the boat got started. Had an inspection been made of the entire hold before sailing, the condition of the lighter would have been readily ascertained. Whether or not Roberts knew of that particular leak was not clear from the testimony, but he was undoubtedly in a position to have discovered the leak, and would have done so,

had he carried out what he understood to be his duty.

Upon these findings of fact, the court held upon the authority of The Republic, 61 F. 109, 9 C. C. A. 386, and The Colima (D. C.) 82 F. 665, that limitation of liability should be denied, citing the following quotation from The Colima:

"The knowledge or privity, that excludes the operation of the statute, must therefore be in a measure actual, and not merely constructive; that is, actual through the owner's knowledge, or authorization, or immediate control of the wrongful acts or conditions, or through some kind of personal participation in them. * * * If * * * the superintendent had been either charged personally with the duty of directing or managing the distribution of this cargo, with reference to the stability of the ship, or had assumed that function, the company would perhaps have been 'privy' to any defects in loading, arising from the negligence of workmen under his immediate direction and control, whether he had actual knowledge of their delinquencies or not."

It has been held by the Supreme Court that mere negligence, pure and simple, in and of itself, does not necessarily establish the existence on the part of the owner of a vessel of privity and knowledge within the meaning of the limitation statutes. The La Bourgogne, 210 U. S. 122, 28 S. Ct. 664, 52 L. Ed. 973. There must be something more than mere thoughtlessness or casual oversight. See the discussion of Judge Rose in The Virginia, 264 F. 986, at page 997 (affirmed in Hines v. Butler [C. C. A.] 278 F. 877) wherein it is said:

"Perhaps the owner cannot deny privity or knowledge, if the disaster happened in whole or in part because he more or less consciously took a chance, or closed his eyes to something he did not want to be bothered about, or because in some other way he fell short of what a fair-minded, well-informed, and impartial man would feel was his moral duty in the premises."

There can be no question that the conduct of the president of Graham & Co. comes within this description. See, also, Quinlan v. Pew, 56 F. 111, 5 C. C. A. 438; The Annie Faxon, 75 F. 312, 21 C. C. A. 366; The Colima (D. C.) 82 F. 665; Sanbern v. Wright & Cobb Lighterage Co. (D. C.) 171 F. 449; In re Reichert Towing Line, 251 F. 214, 163 C. C. A. 370; Texas & Gulf S. S. Co. v. Parker (C. C. A.) 263 F. 864; The Rambler (C. C. A.) 290 F. 791.

Thus it appears that there was a finding of privity on the part of Graham & Co. in respect to unseaworthiness, and that it was not necessary for the court also to find that Roberts had personal knowledge of the unseaworthiness in order to reach the conclusion that limitation of liability should be denied. The decree of the court, in expressly finding, not only privity, but knowledge, went unnecessarily far, and for the purposes of this opinion it will be considered that the complicity of Graham & Co. in the sinking of the vessel is limited to privity, and does not include knowledge.

The insurance company in defense attacks the sufficiency of the designation of the libelants as having been intended to have been insured, on the ground that Graham & Co.'s president, after bankruptcy, had no authority to act for it. It is also charged that the cargo owners had effected specific insurance on their cargo, which therefore, under the express terms of section 16, above set out, was not covered by the policy in suit. Such insurance is admitted, but the cargo owners nevertheless insist that their loss was insured, since section 16 of the policy relates, not only to the property rights of Graham & Co. in the cargo, but also to the legal liability of Graham & Co. for the loss of or damage to merchandise, should any such liability exist.

[1] Assuming, for the purpose of this decision, that the legal liability of the shipowner was covered, notwithstanding the specific insurance, and that a designation of the shipper as the beneficiary of the insurance might have been made, and was validly made in this case, it is necessary to consider the main defense that the policy was avoided because the lighter left the ship in a condition of unseaworthiness, of which its owner had privity or knowledge. The libelants claim that the unseaworthiness of the lighter is no defense to the suit, because the policy of insurance was a time policy, as distinguished from a voyage policy, and covered, not only loss or damage to cargo, but also the liability of the shipowner therefor.

There is some difference in opinion in the United States as to the exact extent of the warranty of seaworthiness in time policies. 26 Cyc. 644, 645. It was held by Circuit Justice Grier, in the case of Rouse v. Insurance Co., Fed. Cas. No. 12,089, that a warranty of seaworthiness is implied in a time policy of marine insurance made on a vessel then in her home port. The cases of Jones v. Insurance Co., Fed. Cas. No. 7,470, and the English case of Gibson v. Small (1853)

4 H. L. C. 353, were considered, and it was ruled that, although the warranty would be implied, under the circumstances of the case at bar, it would not be implied in the case of a time policy on a vessel in a distant ocean, of whose situation the owner could know nothing at the time the insurance was made. The court thought that the distinction was one which, for motives of public policy, should be strictly enforced.

In Insurance Co. v. Smith, 124 U. S. 405, 8 S. Ct. 534, 31 L. Ed. 497, there was a time policy of marine insurance containing an express warranty of seaworthiness. While it was not necessary to the decision of the case, the court, through Mr. Justice Blatchford, citing amongst others the case of Rouse v. Insurance Co., supra, said:

"In the insurance of a vessel by a time policy, the warranty of seaworthiness is complied with if the vessel be seaworthy at the commencement of the risk, and the fact that she subsequently sustains damage, and is not properly refitted at an intermediate port, does not discharge the insurer from subsequent risk or loss, provided such loss be not the consequence of the omission. A defect of seaworthiness, arising after the commencement of the risk, and permitted to continue from bad faith or want of ordinary prudence or diligence on the part of the insured or his agents, discharges the insurer from liability for any loss which is the consequence of such bad faith, or want of prudence or diligence, but does not affect the contract of insurance as to any other risk or loss covered by the policy and not caused or increased by such particular defect."

In New York & P. R. S. S. Co. v. Ætna Insurance Co., 204 F. 255, 122 C. C. A. 523, a time policy of marine insurance which contained no express warranty of seaworthiness was considered. The court found as a fact that the vessel was seaworthy when she left port, but discussed the question of an implied warranty of seaworthiness in a time policy, and said:

"The law in England seems to be very clear that there is no implied warranty of seaworthiness in the case of time policies. Gow on Marine Insurance, 272. On the other hand, our courts seem to take the view that although there may be no implied warranty of seaworthiness, still, if the vessel is in a port where repairs may be made, or equipment and supplies obtained, the insured cannot recover for any loss caused by the want of due diligence in making repairs and obtaining equipment or supplies."

The English rule is summed up in the

following provisions of the Act of Parliament of December 21, 1906, known as the Marine Insurance Act:

"Sec. 39. (1) In a voyage policy, there is an implied warranty that at the commencement of the voyage, the ship shall be seaworthy for the purpose of the particular adventure insured. * * *

"(5) In a time policy, there is no implied warranty that the ship shall be seaworthy at any stage of the adventure, but where, with the privity of the assured, the ship is sent to sea in an unseaworthy state, the insurer is not liable for any loss attributable to unseaworthiness,"

—which codify the law already promulgated by the courts, as shown by the following cases: Gibson v. Small (1853) 4 H. L. C. 353; Dudgeon v. Pembrook (1877) Law Reports 2 App. Cas. 284; Thompson v. Hopper (1856) 6 E. & B. 172; Trinder Anderson & Co. v. Thames & Mercey Marine Insurance Company, [1898] 2 Q. B. 114. See Arnould on Marine Insurance (11th Ed.) §§ 685a and 697.

It is therefore clear that, notwithstanding the absence of an implied warranty of seaworthiness in a time policy, in the English law, nevertheless the insurer is released for any loss attributable to unseaworthiness, if the ship is sent to sea in an unseaworthy state with the privity of the assured. Such privity is no doubt the equivalent of the privity or knowledge which under R. S. § 4283 (Comp. St. § 8021), prevents the limitation of liability of a shipowner for loss to property or goods on board his vessel. See The Republic, 61 F. 109, 9 C. C. A. 386. Hence, even under the more liberal English rule, the policy in the instant case, considered as a time policy merely, would have been avoided, for the privity and knowledge of the president and general manager is, of course, imputed to the corporation. Pocomoke Guano Co. v. Eastern Transportation Co. (C. C. A.) 285 F. 7. Hence it becomes unnecessary to decide the precise extent of the warranty of seaworthiness in a time policy in the American law. Obviously it must go at least as far as in the English statute. See 1 Parsons on Marine Insurance, pp. 389–401.

[2] The cargo owners, however, point out that the policy in suit is not only a time policy, but also a liability policy, and therefore, it is said, necessarily covers losses due to unseaworthiness. The case of The C. S. Holmes (D. C.) 5 F.(2d) 358, is cited, wherein it was held that a marine policy, insuring a shipowner in respect to liability incurred for loss or damage to goods arising from any cause whatever, does not imply a warranty of seaworthiness of the ship, for otherwise the policy would be ineffective. The argument was that under the Harter Act (Comp. St. §§ 8029–8035), a ship is not liable to the cargo, unless she is unseaworthy, or unless she fails either in proper loading, stowage, custody, or care of cargo, which defaults, as a matter of law, render her unseaworthy. Hence an implication of a warranty of seaworthiness in such a policy would destroy it, and the shipowner would have paid premiums to no avail. The court also considered whether the ship was unseaworthy with the actual fault and privity of the owner, for it was conceded that, if this were the case, there could be no recovery.

Adopting for the purpose of this case the principle laid down, it is still necessary to decide whether that which was there conceded may be here decided to be good law. No decision on the point has been cited, but nevertheless a consideration of the great part that seaworthiness plays in maritime transactions leads to a determination of the question. In every contract of carriage by sea or of charter party, unless otherwise specified, seaworthiness is implied, and the owner undertakes absolutely that the vessel shall be fit on sailing, and not merely that he has done his best to make her so. The warranty of seaworthiness in marine insurance has already been considered, but the reasons for its existence in voyage policies may be reexamined with profit. In the elaborate discussion in the leading case of Gibson v. Small, supra, it was shown that in voyage policies the owner knows or has the means of knowing the condition of his ship, and it is therefore his duty towards the mariners, for the safety of their lives, and towards the merchants, for the safety of their goods, to make sure that the ship shall in every respect be seaworthy. It may be properly implied, therefore, that the owner, as a foundation for the contract of insurance, warrants the ship, and the premiums may be calculated on the principle that the perils insured against are to be borne by a vessel prepared to resist, and, if possible, overcome them. The same considerations would apply with equal force to a time policy, were it not for the fact that, in many cases, the owner is not in a position to inform himself of the condition of his vessel, and to remedy it, if defective. But, even in the case of a time policy, under the English law, a full disclosure at the time of its execution of facts pertaining to the seaworthiness of the vessel is requisite (38 Corpus Juris, 1054), and,

as we have seen, the policy is avoided if the owner, with privity, sends an unseaworthy ship to sea.

No reason suggests itself why the insurer in a maritime liability policy is not entitled to similar protection when the insured is guilty of like default. Although the policy is framed to indemnify the insured from losses due to his neglects, it is not the purpose to protect him when, with privity or knowledge, he assumes a risk repugnant to the very nature of the business. Considering the absolute obligation of the carrier in the ordinary case to furnish a seaworthy ship, whereby he becomes an insurer in this respect of the goods taken on board, a marine liability policy is in the nature of a reinsurance of the risk, and the principles of reinsurance may be applied. It is well settled that, where an existing risk is reinsured, nothing should be done by the reinsured without the consent of the insurer to alter substantially the nature or extent of the risk, whereby the reinsurer may be prejudiced or his liability increased, and such an act will avoid the policy or contract of reinsurance. St. Nicholas Ins. Co. v. Mer. Mutual Fire Ins., 83 N. Y. 604; Maritime Ins. Co. v. Stern, [1901] 2 K. B. 912; Lower Ryan & Ins. Ass'n v. Sedgwick, [1899] 1 Q. B. 179, 739; Fire Ins. Ass'n v. Canada Ins. Co., 8 Ontario, 481; Norwick Union Fire Ins. Co. v. Colonial Fire Ins. Co., [1922] 2 K. B. 461. If the insured in a liability policy sends out a ship, with privity or knowledge of her insufficiency, he substantially alters the nature of the contemplated risk, increases the normal liability, and thereby vitiates the policy. As was said by Mr. Justice Lawrence in Christie v. Secretan, 8 Term Rep. 192, 198: "The consideration of [marine] insurance is paid in order that the owner of a ship, which is capable of performing the voyage, may be indemnified against certain contingencies, and it supposes the possibility of the underwriters gaining the premium."

The libel will be dismissed.