## THE COLIMA.

(District Court, S. D. New York. July 24, 1897.)

1. CAPSIZING AT SEA—SEAWORTHINESS—TENDER MODEL—DECK LOAD—DISTRIBUTION OF CARGO—STORMS.

The steamship C. on a voyage from San Francisco to Panama capsized in a storm about 25 miles off the Mexican coast not far from Manzanillo, at about 11 a. m., May 27, 1895. The weather did not amount to a gale until 8 a. m., but at 6 p. m. the master, in order to head the seas, had turned the ship two points off her course. The ship could not be kept head to the seas, and occasionally fell off into the trough of the sea where she rolled heavily, and in three successive larger waves was turned over completely with nearly a total loss of ship, passengers and crew. She carried a deck load of 47 tons of lumber. Deck loads were customary on such trips. Such storms were not expected at that time; but the disaster was within five weeks of the season of dangerous storms on that coast. The ship had run for 20 years on that line. Her beam was somewhat narrower in comparison with her depth than in most steamers of her class. Upon very great conflict in the evidence as to the nature and severity of the storm: *Held*, that the storm was not phenomenal in character, nor more severe than every steamer should be prepared to meet; that a steamer is not seaworthy, which in such a storm can neither keep out of the trough of the sea, nor ride safely in it; that though a deck load was justifiable under the custom of San Francisco, no custom can validate navigation by an unstable ship, nor excuse the neglect to load sufficient heavy weights below; that such neglect combined with the naturally tender model of the ship was the cause of this catastrophe, through shifting of the cargo when rolling heavily in the trough of the sea, constituting unseaworthiness for which the ship and owners are answerable, except so far as relieved by statute.

**2.** HARTER ACT — NEGLIGENCE IN LOADING — LIMITATION OF LIABILITY — REV. ST. § 4283.

It being found that the disaster was caused through neglect to load the vessel in such a manner as to secure reasonable and necessary stability, and that the loading was done by the stevedore under the immediate supervision and direction of the master and first officer of the ship, but without any other supervision or immediate control by any of the general officers of the corporate owner: *Held* (1) that this negligence was in law imputable to the owner so far as to render inapplicable the exemption from liability provided by the third section of the Harter act, requiring the "exercise of due diligence by the owner"; (2) that the owner was entitled to the limitation of liability provided by section 4283 of the Revised Statutes, inasmuch as the negligence was in the superintendence of the loading, which was properly committed to the master and the first officer of the ship, and specially belonged to their duties, and the neglect was not in fact, nor by construction of law, within the knowledge or privity of the owner, or any of its general officers; (3) that the cargo was entitled to participate with other claims in the distribution of the proceeds of the ship and freight.

Hoadly, Lauterbach & Johnson, for petitioner the Pacific Mail Steamship Co.

R. D. Benedict and Maxwell Evarts, advocates.

Butler, Notman, Joline & Mynderse, Convers & Kirlin, and Cowen, Wing, Putnam & Burlingham, for creditors.

BROWN, District Judge. The petition in the above matter was filed by the above-named company, a New York corporation and owner of the steamship Colima, for a limitation of liability under section 4283 of the .Revised Statutes, against claims arising out of the loss of that steamer by capsizing in a storm about 25 miles off the coast of Mexico, at about 11 a. m. of May 27, 1895. The steamer and her cargo were totally lost; and out of about 209 persons, composing her passengers and crew, only 29 or 30 were saved. The sum of $23,846.58, freight, has been paid into court or secured.

The petitioner alleges that the loss of the steamer arose through perils of the seas, without any negligence or fault; or if there was fault, that the loss and damage were done. occasioned or incurred without the privity or knowledge of the owner; that due diligence was used to make the ship seaworthy, and exemption is therefore claimed also under the act of 1893. Six answers to the petition have been interposed by various damage claimants, for the loss of life, loss of cargo, baggage, and effects, and for personal injuries and suffering. The answers deny that the loss was by sea perils and aver that it arose through the negligence of the petitioner and of the persons in charge of the ship, with the petitioner's privity and knowledge; that the steamship was sent to sea in an unseaworthy condition by reason of an improper deck load, and of bad stowage of the cargo, and that she was not properly manned and equipped for the voyage. Several of the answers also allege that the petitioner failed to exercise due diligence to make the ship seaworthy; and that the loss also occurred through the incompetence and inefficiency of her master and officers, and through their negligent and unskillful management of the ship. The principal question litigated is whether through her model and the mode of loading and distributing her cargo, she was so lacking in stability as to be deemed unseaworthy.

The Colima was one of a line of steamers engaged in the carriage of passengers and cargo between the ports of San Francisco and Panama, and intermediate ports. She was built of iron, in 1873, 312 feet long, 40 feet extreme beam on her steerage deck (architecturally her main deck) with a tumble home of 4 feet, to 36 feet beam on the hurricane deck; depth 36¼ feet from the floor of the hold to the hurricane deck, 29 feet 1 inch to the main deck, and 20¼ feet to the steerage deck. Her tonnage was 2,906 gross tons, 2,143 tons net. Her bottom plates were about 23 inches below the floor of the hold, and her keel 10 inches deeper. Forward of her engine room she had five decks above the hold, namely, the orlop, freight, steerage, main, and hurricane deck; aft, there was no orlop deck. On her hurricane deck she carried two houses, one 4 feet long, the other 25 feet, each about 7 feet high.

The steamer sailed from San Francisco on May 18, 1895, 4½ feet by the stern, with a mean draft of 20½ feet. Her Lloyd's load mark allowed 22½ feet. She had on board a mixed cargo, amounting in all to about 1,476 long tons weight, viz.: 1,166 tons of heavy dead weight cargo, and 666 "measurement" tons of light cargo, weighing 310 long tons. She also carried 140 tons of ballast, 500 tons of coal in her bunkers, 65 tons of stores, and about 13,000 gallons of water for use on the voyage. Of her dead weight cargo, about 821 long tons consisted of flour and corn, the larger part of which probably was stored in the lower hold and on the orlop deck. But light and heavy goods, destined for the same port, were generally stored together, for convenience in unloading at the eight or nine way ports. A deck load of lumber, about 3½ to 4 feet high, and of from 39 to 43 long tons (43 to 47 short tons) was carried on the hurricane deck, extending forward from a few feet aft of the fore rigging to within three or four feet of the capstan, and across the ship to within about 2½ feet of the rail on each side, to which the lumber was securely lashed. Mr. Bingham, the stevedore, thought that two loads or about four tons of the lumber were put below the hurricane deck, but as he spoke from information only, the objection to that testimony must be sustained, and there is no competent evidence, therefore, that any of the 47 tons of lumber were below deck.

On leaving San Francisco the ship rolled heavily in crossing the bar, so that Pilot Kerts found difficulty in getting off the ship. He says the bar was very rough, though not breaking. Others say the bar was not very rough; if it was, the tide gauge on shore did not indicate it. At the way ports of Mazatlan, San Blas and Manzanillo, 67 long tons of cargo were discharged and 77 long tons taken on board. While lying at these way-ports, as well as in crossing the bar, several witnesses testify to the excessive rolling of the ship; and the seamen Zangaree and Johnson then considered the ship cranky. The pilots say she behaved well.

The steamer left Manzanillo at 4 p. m. of May 26th, with her mean draft diminished to about 19½ feet, through the consumption of fuel during the previous eight days. The weather was then clear, and the sea calm, with swells from the southeast. A blood-red sunset was thought by some seamen to indicate wind; and later the captain

predicted a storm. Between midnight and 4 a. m. the weather became squally, with increasing wind. At 3:40 a. m. in rounding a point, the ship's course was changed from S. E. to E. S. E. At 6 a. m., as the ship was rolling considerably, she was again turned to the S. E., in order to head the seas; and that course, so far as possible, was thereafter maintained. It was not until 8 a. m. that the weather amounted to a gale, but the wind and seas were still increasing. By 9 a. m. she was rolling heavily and began to have difficulty in keeping steerageway. At that time she fell off into the trough of the sea for about 5 minutes, then came up, but soon fell off again, for almost 15 minutes, during which time she shipped a sea aft which carried away the after-house and injured one seaman at the relieving tackle. More steam was ordered and given; she came up again head to the sea, but did not maintain herself steadily and continued to fall off from time to time. Nearly all the witnesses say that by this time the ship was rolling very heavily.

Between 9 and 10 a. m. oil was thrown over to ease the ship, but without much avail. About 10:15 she again fell off into the trough of the sea, took a heavy lurch, and shipped a sea on the lee side, so as to carry away three of the starboard life boats, shift her cargo, and give her a strong list to starboard, from which she never recovered. Eight of the twelve witnesses from the Colima testify to this strong list about a half hour before the ship went down; five of them testify to great noises heard from below at the same time, which they describe as a rumbling, a thundering, or a blow. The judgment was then formed that the cargo had shifted, and I have no doubt that such was the fact. Several witnesses speak of a slight list from the time of leaving San Francisco. I do not find sufficient evidence of any material list until that above stated. When the storm came on the natural inclination of the ship to leeward, increasing in the increasing wind and sea, affords a sufficient explanation of the witnesses' impressions as to an increasing list prior to that above referred to.

From the time of this heavy roll and list taken about half an hour before she sank there was much general alarm on board, though three of the petitioner's witnesses disclaim any such alarm. Several of the witnesses testify to a gradual increase of the list to starboard thereafter.

There is no evidence of any further efforts to relieve the ship until just before the final disaster. She had two masts, schooner rigged, and a full set of sails below; but except one, or at most two, of the head sails, none of the sails were bent or ready for use; so that the spanker could not be set in order to assist in keeping head to the sea, by the use of which as two of the seamen testify, the steamer might possibly have been saved.

At 10:40 a. m., the ship being again in the trough of the sea and heading S. by W., the third mate was ordered by the captain to cut loose the deck-load, which was done at once. It did not move, however, immediately; but just as the lashings were cut, three heavy seas came in succession, and the ship, not recovering from the one before she was struck by the next, was carried over completely upon her beam ends, so that her masts touched the water and her decks

were perpendicular, and in five minutes after she filled and sank stern first. The captain remained on the bridge to the last.

Before the vessel sank a few of the passengers and crew had been carried away by the lee wash; many others made their way to the outside of the ship and along the keel, where a few, including the third mate, jumped overboard, while the rest remained there until the ship went down. Soon afterwards the sky partly cleared, the sun became visible, and the wind was much abated; but after 15 or 30 minutes, a squall broke forth with a violence that seemed much greater than before. The small boats, rafts, or wreckage on which the passengers and crew had taken refuge, or to which they were clinging, were overturned; pieces of the floating lumber or wreckage were caught up from the crests of the waves by the circling wind, carried for considerable distances through the air and dashed against the persons who could not avoid them, by which some were killed and many others injured. This soon abated and after a time, variously estimated from one to three hours, the weather again became calm. Most of the 29 or 30 survivors were picked up the next day by the steamer San Juan; a few reached the shore on rafts. Hansen, the third mate, was the only officer who was saved.

Of the survivors, twelve have been examined as witnesses in the present case; four for the petitioner and eight for the claimants. Many other witnesses have also been called. The testimony is voluminous, and conflicting as respects the nature and severity of the storm, and the loading, the stability, the behavior and the seaworthiness of the ship. Some of the apparent conflict is no doubt due to the lack of distinction between the weather before the ship sank and the weather that followed. All that is material to the Colima is its character before she went down, not what it became afterwards.

1. To exempt the petitioner from all liability under section 4283, it must appear that the loss or damage was "done or incurred without the petitioner's privity or knowledge." To exempt it under the Harter act from the claims of cargo owners (27 Stat. 445; 2 Supp. Rev. St. p. 81), it must appear that the ship was seaworthy in fact, or that "due diligence" was used to make her so. The burden of proof is upon the petitioner. It accordingly accounts for the disaster by the severity of the storm, contending that the storm was so extraordinary, that the loss of the ship affords no presumption of her unseaworthiness, and that it was only one of the unavoidable risks and perils of the sea.

This is a crucial point. For no steamship can be deemed fit for a voyage if in an ordinary storm, when not disabled, she can neither keep out of the trough of the sea, nor ride safely in it. Steamers ought not to capsize, except under most extraordinary circumstances. As respects stability, they have naturally a double advantage over sail vessels, in the great weight of their engines and boilers below, and in the absence of heavy spars and sails aloft. They should be stable enough to lie safely, in ordinary storms, in the trough of the sea; because they are liable at any time to be forced into that situation, and often are forced into it, for considerable periods, by the accidental disabling of their machinery. Mr. Vining and Mr. Martin, experts of great experience, say that the Colima was of a tender model, from

the narrowness of her beam (40 to 36 feet) in proportion to her depth (29.1 to 36 feet). Their testimony is to some extent confirmed by a comparison of her dimensions with recognized standards of stability and with other vessels of her class. Her extreme breadth of 40 feet, as against a depth of 29.1 feet, was nearly 7 per cent. below the average proportion; and her "tumble home" of 4 feet materially increased this disadvantage. She was naturally, therefore, a somewhat tender ship, and required more than usual care in the distribution of her cargo to keep abundant heavy weight in the hold. Walton's Know Your Own Ship, 136, 137, 110, 111. Unless, therefore, the weight of evidence shows that this storm was really one of such extraordinary severity that a steamship could not reasonably be expected to weather it, the fact that the Colima capsized in it, in the absence of any certain evidence of the amount of heavy weight cargo in the hold, warrants the inference that she was lacking in seaworthy stability through her tender model and the mode of loading combined; and such is my conclusion.

As to the character of the storm the petitioner has examined four witnesses from the Colima; the claimants, eight. The witnesses for the former are Hansen, third mate; Carpenter, the ship's storekeeper; Avilas, the engineer's storekeeper; and Sutherland, a passenger. Of the claimants' eight witnesses from the Colima, four were seamen, viz.: Johnson and Aikman, belonging to the Colima's crew, and Ross and Zangaree, who were seamen in the United States navy, returning as passengers to New York. The other four were passengers and all intelligent witnesses. The testimony of Ross, boatswain's mate on the battle ship Texas, I consider specially valuable, from his long experience of 31 years in the navy, and 39 years as seaman. From his familiarity with the sea, he apparently did not make much account of the excessive rolling of the vessel, to which most of the witnesses testify, until about half an hour before she went down. He says that she then began to roll very heavily, and in a heavy roll, took a list to starboard, from which she did not afterwards recover; that she shifted her cargo at that time, as he judged, agreeing on that point with six of the other witnesses. From that time he was alarmed for their safety.

Both Ross and Zangaree say that the storm was an ordinary gale, or only a little more, and nothing like a hurricane or a cyclone. Johnson and Aikman and the four passengers say the same. Aikman says the storm before the ship went down was "nothing out of common, nothing that a vessel ought to take any notice of." Johnson also says that the Colima acted cranky from the start; that in passing over the bar she "rolled deep and recovered slowly"; because top-heavy in the whole loading from having too much on deck, and because the aft hold was only about half full; to which Aikman also testifies in a general way, though it appears on cross-examination that he did not fully examine the hold in the darkness. Johnson further says that the Colima always acted a little cranky, and would always roll in the outside ports down the coast, and was "never considered a steady ship, in his opinion and in that of everybody else." Zangaree also says that she acted cranky; and that on the coast, before the storm,

she "rolled more than any other vessel he was ever in." Other witnesses speak of her excessive rolling before the storm; and nearly all testify to her heavy rolling after 9 a. m., when she fell into the trough of the sea; and with this agrees the shifting, about that time, of the loosely piled salt on the steerage deck, and of the cases and drums of oil on the main deck. Nine of the witnesses testify to the heavy list taken a half hour before she went down. Zangaree, Boyd and Cushing say this list was from 20° to 30°. Six of the witnesses testify to the rumbling noises heard below, indicating a shifting of the cargo at that time, and to the increasing list subsequently, as would naturally ensue. Water temporarily taken on deck by the lee wash, does not account for such a list.

Hansen, on the other hand, who had been on the Colima 22 months and made 10 voyages in her, and who came on watch at 8 a. m., says that the weather was then a gale and increasing, with a cross, choppy sea, and the wind in puffs, squally, unsteady and varying all the time from three to four points viz., from E. x S. to S. Several witnesses state the contrary; and with that agrees Hansen's statement, that at 10:40 a. m. when the ship was in the trough of the sea, five minutes before she went down, "she was heading W. x S." He says he was in a storm in the Colima about a year before; but that this storm after 10 a. m., was the worst he was ever in. He was not used to the Atlantic. After the ship went down, there was a lull, and after that a squall which seemed fiercer than before, with the wind circling. The ship fell off, he says, because she could not get headway enough against wind and sea to answer her helm; he had had no similar difficulty before with the Colima, or in any other steamer; and he says she showed no signs of being cranky, or of excessive rolling, but behaved well throughout, until the three seas came that carried her over; and that he would call her "a very stiff ship, very steady indeed." He says nothing of any permanent list taken a half hour before the three waves, though at 10:40 a. m., five minutes before she went down, he says "she was leaning about 10 degrees to starboard," and that the cargo did not shift. Up to 9 a. m., he says there was nothing particular calling for mention in the log beyond what he had noted at 4 a. m.; that they "were used to heavy wind and squalls, and didn't count that much of anything."

Avilas was below in the engine department until about half an hour before the ship went down, when he was sent up to call all hands in order to right the things that had gone adrift below; he confirms the heavy list taken at that time, which he says he noticed below, but which was more noticeable on deck. The passenger Sutherland had never been in a storm at sea before; he had seen heavier seas, but the wind he says was the worst he ever saw. His account is very confused and untrustworthy. Carpenter says that at 5:30 a. m. the weather was not bad, but squally and stormy; that it began to increase about 8 a. m., and that the wind and seas got heavier; before the three seas struck her, the wind, he says, was blowing heavy and a big sea running, but she was behaving well enough; he noticed her rolling, but it was not very heavy before the three seas. He was then on the main deck, but when those seas came he ran to the hurricane

deck, just as Hansen had cut loose the lumber. He heard nothing of any shifting of cargo, and he makes no mention of any previous list, or heavy lurch. I find nowhere any contradiction of Johnson's testimony, that from the first the Colima "rolled deep and recovered slowly"; the latter a circumstance of the greatest significance. Carpenter further says that the storm was the worst he was ever in; but from the context this seems to refer to his experiences when he was in the water in the subsequent squall after the ship sank. It is at that time, and not before, that the squall is described by some of the witnesses as a cyclone; and though the testimony derived from the impressions and experiences of the witnesses while struggling in the water, does not afford a very trusty basis for a comparison of the storm as it was then with the preceding storm, as felt on shipboard, or with other storms; still it may be, from the graphic incidents narrated, that after the short clearing up after the ship went down, the squall that broke out afresh was much severer than before, and for a brief period had the character of a local cyclone or whirlwind. It is evident, however, that this character was not long retained, and in from one to three hours, the weather was again calm. The question here is not whether there was a brief cyclone or whirlwind in the squall that arose after the ship sank, but what was the weather up to the time she went down. Up to that time no incidents are mentioned analogous to those occurring afterwards, nor anything suggesting a whirlwind, hurricane, or cyclone, as that word is ordinarily understood. The weight of evidence is that when the ship went down the storm was "but little more than an ordinary gale," "nothing that a vessel like the Colima ought to take any notice of."

The testimony of the claimants' witnesses is, indeed, given in their own interest, as all have claims which their evidence supports; but I have not found that mere pecuniary interest is usually more productive of distorted testimony than is often caused by the bias of officers and seamen when testifying in behalf of their own ship, and their own employers. The claimants' testimony seems for the most part free from extravagance and inconsistency. Carpenter's statement on the other hand, that the ship was not rolling heavily until the "three seas" that capsized her, is not consistent with a "big sea running," to which he testifies; and Hansen's statement that he "should call the Colima a very stiff ship, very steady indeed," is so contrary to the great weight of evidence, that I cannot give much credit to any of his testimony as to matters of opinion, judgment, or estimate. The fact also that Hansen, Carpenter and Sutherland make no mention of the strong and permanent list to starboard, taken about half an hour before the ship sank, to which the other nine witnesses testify and of which I cannot have any doubt,—a circumstance of vital import, which they must have observed and could not have forgotten,—seriously discredits the candor of their narratives, and the confidence to be placed in their testimony.

As respects the character of the storm before the ship went down, the weight of the direct evidence, therefore, as I have already said, seems to me decidedly with the claimants; that this storm was not a hurricane, nor a cyclone, as that word is commonly understood, nor a

storm of such severity, nor accompanied by any such extraordinary features, as to account for the shifting of cargo and capsizing of a seaworthy steamship. Although most of our extensive storms are rotary or cyclonic in movement, the term as thus used does not denote unusual violence; many of such storms are not severe; and all seagoing vessels are expected to be prepared to meet them. The weight of evidence, and even Hansen's testimony itself, carefully examined, does not show any such continuous or permanent change of wind as to justify the conclusion that this storm was of a cyclonic character. It was, moreover, comparatively brief and limited in extent. It did not amount to a gale for more than six or seven hours altogether; consisting, as Zangaree describes it, of two heavy squalls, one from 8 to 11 a. m. and the other from 12 to about 3 p. m., with the sun shining out between. No maritime reports give it any wide area. The San Juan felt it 125 to 150 miles to the southward of the Colima, and lay to until 4 p. m.; but without damage or any other incidents mentioned. Of two or three schooners making a harbor on the Mexican coast, one ran upon the rocks. No other casualty is reported; while a little 20-foot sailing boat weathered it, and came into Manzanillo the next day, without damage.

Other negative circumstances confirm the moderate character of this storm, at least up to the time the Colima sank. No seas were shipped forward, nor anywhere on the weather side; nothing on deck was carried away or damaged there. While the ship was kept head to the sea or nearly so, she suffered no damage. It was only when she was in the trough of the sea and rolling heavily that any seas were shipped or injury done; viz. once at about 9 a. m., when a sea damaged her houses aft; and again at about 10:15, or a half hour before she went down, when the three starboard boats were carried away by the lee wash, at the time of the heavy lurch that shifted her cargo. I accept this shifting as a fact; not merely from the direct testimony as to the noises heard below, at that time, but because in no other way can the heavy and increasing list to starboard from that time on, which so many witnesses testify to, be explained. Again, many persons, while the ship lay upon her beam ends and in the trough of the sea, clambered upon the outside along the keel, and remained there, neither blown off, nor washed off, till the vessel went down. None of these circumstances are compatible with an extraordinary wind or sea.

My conclusion therefore, on this branch of the case, from the direct and circumstantial evidence is, that the Colima capsized in a heavy squall or brief storm but little above an ordinary gale, because from her tender model and mode of loading combined, she lacked the usual and requisite stability, or righting power; that in consequence of that fault, she rolled deeply and recovered slowly, and not being able to keep head to the sea, her rolling was still deeper in the trough of the sea when she fell off; that in that situation, a deep roll at 10:15 caused her cargo to shift to starboard; that this again still further enfeebled and retarded her righting power, so that when three larger seas came in succession, as ordinarily happens from time to time in all storms, and caught her in the trough of the sea, she was unable to recover, through feebleness of righting power, and was consequently carried over upon

her beam ends.. This is but the natural progress of an unstable ship in an ordinary storm, when she cannot keep out of the trough of the sea. Nothing phenomenal is needed to explain it. If she had seaworthy stability and was properly managed, something phenomenal would be needed to explain this disaster; the weight of evidence does not indicate the presence of any such phenomenal cause. It is a significant circumstance, also, that in order to head the seas, the master at 6 a. m., put the ship $2\frac{1}{4}$ points off her course. This is not usually done by a steamship, even in the midst of an ordinary gale. That the master did this two hours before the weather became an ordinary gale, is, in the absence of any other explanation, persuasive evidence that the ship was not in condition to meet a storm, and that he knew it, either from knowing the mode of loading, or from the behavior of the ship up to that time.

2. It is urged that the Colima ought to be held seaworthy, because she had run upon this route for 20 years without accident, loaded during the preceding 5 years by the same stevedores, in the same general manner, and in a way testified to as first class; and because upon the mode of loading described, competent experts in San Francisco have testified that she was perfectly seaworthy, and that the deck load had nothing to do with the disaster; and also because at that season storms were not to be anticipated.

(a) But if the above conclusion as to the character of this storm is correct, none of these considerations meet the case. If the Colima had been making these voyages for 20 years, she must have been in many such storms before. How she behaved in them is not shown, except that Hansen says she never before fell off into the trough of the sea during the 22 months he was in her, including one storm about a year before. If she had no previous trouble, the present trouble presumptively arose from her different trim and stability, or from some other defects in the ship or her machinery not disclosed. It was not till 10 a. m., that even Hansen says this storm became such as he was never in before; but the ship fell off in the trough of the sea from 9 a. m., on; if, therefore, she did not fall off before this voyage, the trouble here was not in the storm, but in the Colima.

(b) As respects similarity of loading on prior voyages, the evidence furnishes no data for comparison; and even if this were shown it would not suffice, unless the stability of the ship with such loading were established, either by experience in storms, or by definite proof of the distribution of the heavy weight cargo.

(c) It is this lack of definite proof of the mode of distributing the heavy-weight cargo, or of the weight that went into the hold, that makes it impossible, as it seems to me, to solve this case from that side; and requires its solution upon the evidence as to the character of the storm and the behavior of the ship. All that the stevedores can say is, that the heavy cargo went mostly in the lower hold and on the orlop deck; stating also the decks where the goods for different ports were stowed. How large a fraction the word "mostly" represents does not appear; while it does appear that there was more or less heavy cargo on every one of the five decks, including the 43 to 47 tons of lumber on top. It appears that the cargo for Acajutla, for example, was

379 tons (the largest for any single port, except that for San José) and consisted largely of flour; but all of the cargo for this port that was stowed aft, went on the freight deck, and not in the hold. In fact all of the cargo for Panama and for Acapulco itself; and parts of the cargo destined for Acajutla, Champerico, San José and the ports of transfer (at Acapulco) were stored on the freight and steerage decks; and the goods for these ports comprised two-thirds of the cargo, both of heavy and of light goods. None of the San José cargo (531 tons), which was nearly one-third of the whole, went into the lower hold. The practice in loading was, as Woolnough repeatedly states, to put all of the cargo destined for the same port together in the same part of the ship, that is, heavy and light weight together, for convenience in unloading; and the cargo in the lower hold was mixed. Twenty tons of oil, combustibles and live stock, were also on the main deck, which architecturally constituted deck cargo. I have not been able, therefore, to ascertain with any certainty the weight of the goods stored in the hold; but the evidence does indicate that a large proportion of the heavy goods was stored above the hold.

(d) Other evidence makes it doubtful whether the stowage was as full or as compact as the stevedores assert. I have already referred to the statements of Johnson and Aikman, that the aft hold was only about half full. They may be mistaken in this; if not mistaken, the reasons for leaving that space might be for taking in way goods; or because there were not goods enough for the ports represented in the aft hold, to fill the space, on the principle of convenience, which in part governed the loading.

(e) But aside from this, the draft of the ship, her tonnage, and the amount of her cargo spaces, indicate that she was only about two-thirds full. Her "net tonnage" was 2,143 tons; her net cargo capacity, much greater. The entire weight of this cargo was but 1,476 (long) tons. Frear, p. 1084. Mr. Bingham says he has put aboard of her over 2,300 (short) tons, weight and measurement; here she had but 1,950 short tons, weight and measurement. Again, her draft on leaving Manzanillo was 3 feet less than the Lloyd's load mark, equivalent to about 720 long tons less than a full-draft load. So also the cargo spaces occupied for her dead weight and measurement cargo, computed with a pretty wide allowance for variation (Steamship Co. v. Grace, 22 C. C. A. 7, 75 Fed. 1019–1021), seem to me to show that at least one-fourth of the net cargo space was unoccupied. All these circumstances make it probable that the stowage was not so full, nor so compact as it might easily have been; nor such as to prevent shifting under circumstances calculated to cause shifting unless the cargo was very securely stowed.

(f) The testimony of the experts Metcalf and Goodall, as to the seaworthiness of the Colima for this voyage, is materially affected by the uncertainty as to the stowage. The hypothetical questions put to them did not locate the place or places where the supposed 900 tons of flour or heavy cargo were stowed; but their answers are conditional; Metcalf's, upon its stowage in the hold and on the orlop deck (pages 171, 178); Goodall's, upon its stowage "in the bottom of the ship." The latter adds: "Any seafaring man would place that weight in the

lower hold, to see that the vessel, no matter what vessel it is, was stiff enough." Page 210. Evidence that that weight was so placed is precisely what is lacking. There were but 821 tons of flour and corn in all; and it is certain that a considerable part of the flour and corn was not stowed in the lower hold, but above it; some on the orlop deck, and other parts of it above the orlop and on the two decks above. The deck load of lumber was of 43 to 47 (short) tons, instead of 30 to 40, as given in the hypothetical questions; and Metcalf's answer assumed portions of it to be stored on both decks; whereas even if Bingham's information was correct, 43 (short) tons would be on the hurricane deck, and only four tons below. Mr. Metcalf also on cross-examination, says: "If she had any extraordinary light cargo in the lower hold, I would say that she could not carry a deck load. It is a question of stability." Page 170. There was considerable light cargo on board and Woolnough says "there might be furniture all over the ship; he could not tell." Thus evidence of the necessary exclusion of light furniture from the hold is wanting. Page 619.

(g) The usages of the time and port are material in questions relating to the equipment of the ship, the carrying of a deck load, or of different kinds of cargo on the same voyage; the amount and arrangement of dunnage; the proximity of different kinds of goods to each other, and the mode of stowing and securing them. The Titania, 19 Fed. 101; Tidmarsh v. Insurance Co., 4 Mason, 439, Fed. Cas. No. 14,024. But such usages can have little application to questions affecting the stability of the ship. For no custom can validate navigation by unstable ships, nor can custom determine whether a given vessel with a given loading is stable or not. Ships vary greatly in model, and the requirements of loading in order to insure stability vary accordingly. These requirements are matters of positive knowledge, which no usage can affect or vary. Each ship presents her own problem. Custom has little, if any, scope for application. And as the limits of stable loading are determinable by rule for any given ship, no usage or practice can justify a departure from it.

(h) Nor is the fact that storms were not anticipated, or were not usual at that particular time, even if true, any legal justification for sending the Colima to sea unprepared to meet them. The Pacific coast is not exempt from storms. Hansen had been in one about a year before in the Colima, and says they often had heavy squalls; they were used to that, and didn't count that much of anything. Goodall had "met the Colima at sea, sometimes in heavy weather," and Bingham, in accounting for her loss, says: "She got in a gale of wind, and in the center, I suppose, and that is what a good many get in that locality every few years." This catastrophe, moreover, happened within five weeks of the date when, according to the hydrographic office, "the season of dangerous storms sets in." It would be trifling with human life to justify legally a voluntary disregard of the liability to such storms so near the ordinary time of their occurrence.[1] I should add that the superintendent makes no such claim, but states his belief that the ship

---

[1] See The Queen, 78 Fed. 163, as to boisterous weather to be expected at this period.

was fully seaworthy in fact, and that he would not otherwise have allowed her to go to sea. It is, nevertheless, possible, and even probable, that this disaster arose from this single cause, viz.: overconfidence by the master and mate in a continuance of the usual mild weather, and that this led to more regard for the easy and convenient handling of the cargo than for the requirements of stability in loading; and that the aft sails were not bent for the same reason; so that when the storm came, the ship was equally unprepared for it, above deck and below; and hence the unusual order of the master to put the ship off her course in order to head the seas two hours before the weather amounted to a gale.

(i) Considering the height of the hurricane deck, I do not understand how the deck load of from 43 to 47 (short) tons of lumber can be regarded as an immaterial factor in causing this loss. The objection is not to the mere fact that it was a deck load; for the custom of San Francisco is clearly proved to allow that, and the Colima had often carried greater deck loads than this. Its importance here is merely as a part of the distribution of the heavy cargo weights; and this distribution, however legal in other respects, is subject to the prime requirement that it must not prejudice the requisite stability of the ship. Whatever be the model of the ship, a deck load may be safe if there is sufficient weight in the bottom to offset it; otherwise not. The different language of all the experts alike imports this. The influence of a high deck load on a rolling ship, depends not merely on the dead weight and the long leverage that its height gives, but also on its momentum acquired in the movement of rolling and tending to heel the ship over; and the momentum is in proportion to the velocity, or leverage length. Its inertia in resisting the ship's recovery when she is heeled over is in the same proportion; and this is perhaps of still greater importance. Here the center of the deck load being about 2 feet above the hurricane deck, was according to Mr. Frear's computations, about $21\frac{1}{4}$ feet above the water line, while the bottom of the hold was but $16\frac{3}{4}$ feet below it. Again, the bottom of the cargo was $14\frac{1}{2}$ feet below the center of gravity of the whole ship and cargo as he estimates; while the center of the deck load was about 24 feet above it. Its influence on the rolling of the ship and upon her righting power would therefore be equal to that of many times the same weight of cargo on the freight deck, and to about three times its weight on the main deck. I think this factor, therefore, was important, as Mr. Vining and Mr. Martin testified.

(k) I do not consider the very interesting question presented touching the metacentric height of the Colima: (1) Because the metacentric height "is no guide for a vessel's range of stability, but only for small angles of 10 to 12 degrees of inclination." Walton's Know Your Own Ship, p. 131. (2) Because the data upon which Mr. Frear was obliged to work, were not sufficiently fixed. They involve the question of the distribution of cargo in another form.

3. If the Colima had not sufficient stability to cope with the storms she was liable to meet and was on that ground unseaworthy, was "due diligence" used to make her seaworthy, so as to exempt the petitioner

under the third section of the Harter act from all liability to cargo-owners? I think not.

This section has been in several cases adjudged to require due dili-gence, not merely in the personal acts of the owner, but also on the part of the agents he may employ, or to whom he may have committed the work of fitting the vessel for sea. The act requires in other words, due diligence in the work itself. The Mary L. Peters, 68 Fed. 919; The Flamborough, 69 Fed. 470; The Alvena, 74 Fed. 252, affirmed 25 C. C. A. 261, 79 Fed. 973; The Rossmore [1895] 2 Q. B. 408. On any other construction, owners would escape all responsibility for the sea-worthiness of their ships by merely employing agents of good repute, whether any diligence and care to make their vessels seaworthy were in fact exercised or not. On reason and sound policy no such intent in the statute can be supposed. The context and the pre-existing law indicate that the intent of the act is to relieve the shipowner from his previous warranty of absolute seaworthiness in fact, and to sub-stitute for that warranty a warranty only of diligence, to make the ship seaworthy. This difference is of great importance, as it avoids responsibility for latent and undiscoverable defects. But the war-ranty of diligence remains; and this requires the application of the usual rule, that the acts and negligences of the agent are deemed those of the principal.

From other language in the third section of the act the same result follows. For it exempts only from losses by fault "in the navigation or management" of the vessel, and from "dangers of the sea." But a danger of the seas (the clause here invoked), by its settled meaning, does not include a danger which would have been avoided by the use of due diligence in loading or management, and that part of the sec-tion would therefore not apply.

The agents of the petitioner to whom the loading of the Colima was committed, were the master and the first and third mates, who di-rected to which parts of the ship the lots designed for the different ports should go, and the stevedore, whose foreman and employés acted in stowing the cargo under such directions. The master and the first mate having perished in the disaster, there is no evidence as to what rules or cautions they observed, or attempted to observe. But the testimony of Hansen, the third mate, and of Woolnough, the act-ing stevedore's foreman, does not indicate that they recognized any need of caution in loading on account of the Colima's comparatively narrow beam. On the contrary, Hansen, who had charge of stowing the forehold and forward end of the ship, expressly says he should call her "a very stiff ship." If he believed this, he would not naturally distribute the cargo forward with the care that a more tender model requires. The repeated statements of both those witnesses, that con-venience in unloading at the different way ports governed the placing of cargo; the fact that a considerable part of the cargo was light goods; that the cargo in the lower hold was mixed, and that heavy cargo and light cargo were in fact put upon every deck below the hurri-cane deck, with at least 43 (short) tons of lumber there, do not indi-cate diligence in attending to the requirements of the Colima as a

ship of somewhat tender model. In other words, there is an entire lack of evidence that any diligence was exercised of the character required, viz.: a consideration of the exceptional model of the Colima and of what she could safely bear. The burden of proof being upon the petitioner, and no such evidence appearing, the exemption claimed under the Harter act, on the ground of "due diligence," cannot be sustained.

It is further urged that the master's acts in stowing the ship with reference to her stability and seaworthiness, have to do with "the management of the ship," and are therefore within the third section; and some language is cited to that effect from the decision in Worsted Mills v. Knott, 76 Fed. 584. But that case arose upon acts done at a port of call in the course of the voyage; and what was there said had reference to acts designedly done for the management of the ship in the course of the voyage. It is to "management" on the voyage, that the third section of the Harter act refers, as the context indicates, and not to acts like those in the present case, in preparation for the voyage, before it begins.

4. I think the petitioner upon surrender of the freight ($23,846.58) is entitled to the exemption provided by section 4283 of the Revised Statutes as not being privy to the defects in loading, or in the management of the ship at sea, nor having knowledge of them. Privity and knowledge are chargeable upon a corporation when brought home to its principal officers, or to the superintendent who is its representative; and if such privity or knowledge were here brought home to Mr. Schwerin, the petitioner's superintendent, they would be chargeable upon the corporation. But the privity or knowledge referred to in this statute is not that which arises out of the mere relation of principal and agent, by legal construction; if it were, the statute would have nothing to operate upon; since the owner does not become liable at all except for the acts of himself or his agent. The object of this statute, however, was to abridge the liability of shipowners arising out of a merely constructive privity with their agents' acts, by introducing the rule of limited liability prevailing in the general maritime law, upon the terms prescribed by the statute,—so far at least as respects damages for torts; while the act of 1884 extends this limitation to contracts also, except as to seamen's wages. 23 Stat. 57, § 18; 1 Supp. Rev. St. p. 443; Chappell v. Bradshaw, 35 Fed. 923–925; Force v. Insurance Co., Id. 778, 779; Miller v. O'Brien, Id. 779, 783, 59 Fed. 621, affirmed 168 U. S. 287, 18 Sup. Ct. 140; Gokey v. Fort, 44 Fed. 364–367; The Annie Faxon, 66 Fed. 575; Id., 21 C. C. A. 366, 75 Fed. 312, 318, 319. The knowledge or privity that excludes the operation of the statute, must therefore be in a measure actual, and not merely constructive; that is, actual through the owner's knowledge, or authorization, or immediate control of the wrongful acts, or conditions, or through some kind of personal participation in them. The Republic, 9 C. C. A. 386, 61 Fed. 109, 112, 113, and cases there cited.

If Mr. Schwerin, the superintendent, had been either charged personally with the duty of directing or managing the distribution of this cargo, with reference to the stability of the ship, or had assumed that

function, the company would perhaps have been "privy" to any defects in loading, arising from the negligence of workmen under his immediate direction and control, whether he had actual knowledge of their delinquencies or not; since it is the duty of the person in immediate charge and actual control to see and know that proper directions are carried out. However that may be, Mr. Schwerin had no such duty, and assumed no such function. That duty, as the evidence shows, was committed to a competent stevedore, who acted under the immediate direction of the master and first mate, or in conjunction with them. The master and mate were the proper persons to determine and insure the necessary trim and stability of the ship, and are supposed to be specially qualified to do so. Lawrence v. Minturn, 17 How. 100, 111, 116. Whatever mistakes or negligence may have occurred in that work, there is no evidence that Mr. Schwerin knew of them; nor would they naturally have come to his knowledge; and I do not see the least reason to doubt his testimony that he believed that the ship was properly loaded and perfectly seaworthy. The deck load was no indication to the contrary, because deck loads were customary, and safe with proper loading below.

The failure of the master to have the spanker bent, whereby it was not in readiness for use when wanted to keep the steamer head to the seas, was plainly negligence on the voyage without the knowledge or privity of the owner. Though the ship, as I find, was not safely loaded, her real trouble arose from falling off into the trough of the seas, and it was only in that situation that she suffered any damage. From the fact that after 8 a. m., when the storm first became a gale, she fell into the trough of the sea but a few times and for the most part maintained her head to the seas, the inference is strong that, if her spanker had been set as customary under such circumstances, she might have been kept continuously headed to the seas and avoided this calamity, as two of the seamen testify. If that is so, and it seems to me impossible to affirm that it was not, the master's negligence in that regard was one of the immediate causes, though not the sole cause, of this disaster. If, therefore, the accident is to be ascribed, as I think it should be, to bad loading and bad management combined, it is still true that there was no unseaworthiness or fault in the ship herself, or her equipment, and that both of the causes of disaster fell within the special and peculiar duties of the master as such; and considering that neither of them were within the knowledge, or any actual privity or actual personal superintendence of the petitioner or its managing agent, but did belong to the master of the ship in that capacity only and in the exercise of one of his special functions as master, the case is, I think, within the intent as well as the language of section 4283. Butler v. Steamship Co., 130 U. S. 527, 9 Sup. Ct. 612; Craig v. Insurance Co., 141 U. S. 638, 647, 12 Sup. Ct. 97; Quinlan v. Pew, 5 C. C. A. 438, 56 Fed. 111, 115–118; The Annie Faxon, supra; The Republic, supra; In re Meyer, 74 Fed. 881.

Decree for petitioner for limitation of liability on payment into court of the balance of the freight, and that the cargo owners participate in the distribution.