## THE HORAISAN MARU.

### In re MITSUI & CO., Limited.

District Court, S. D. New York.

Aug. 1, 1933.

312

Burlingham, Veeder, Fearey, Clark & Hupper and John L. Galey, all of New York City, for petitioner.

Single & Single and D. D. Crystal, all of New York City, for claimants.

BONDY, District Judge.

This is a petition by the owner of the steamship Horaisan Maru for exemption from or limitation of liability for cargo loss.

The Horaisan Maru arrived at Grays Harbor, Wash., on or about February 20, 1926. She finished loading at Schaefer's Dolphins, on the Chehalis river, which empties into Grays Harbor, March 3, 1926, at about 2 p. m. The deck lashings were completed at about 9 o'clock the next morning. She sailed at 12:15 p. m. March 4th, and proceeded on her way through the harbor along a narrow dredged channel, reaching the bar at the mouth of the harbor at about 3:30 p. m. She struck the bar several times, refused to answer her helm, and was pounded heavily on the bottom by swells. At about 6 p. m. it became necessary for her crew to abandon her and she and practically all her cargo became a total loss.

Petitioner contends that due diligence was used to make the ship seaworthy and that the loss was nonnegligent or resulted not from unseaworthiness but from errors in management of the vessel in that she was navigated too far south of the narrow channel while proceeding over the bar, with the result that she struck the submerged spit south of the channel, and that therefore it is not liable for any loss (27 Stat. 445, 46 USCA § 192). Petitioner further contends that in any case its liability should be limited to the amount of its interest in the vessel and her freight then pending, because if the vessel was unseaworthy, such unseaworthiness was without its

privity or knowledge. Rev. St. § 4283, 46 US CA § 183.

Claimants contend that the petitioner is not entitled to exemption from or limitation of liability because the vessel was unseaworthy when she broke ground on account of her excessive draft, dangerous list, and instability, and that petitioner had knowledge of her unseaworthiness.

On leaving the Dolphins, the Horaisan Maru carried 6,647 long tons of general cargo, about two-thirds of which was lumber, 570,000 feet thereof loaded on deck and 2,195,000 feet below deck. Her deck load was 10 feet in height forward and 11 feet aft. Her draft was 26 feet forward and 26 feet 6 inches aft, the latter being the maximum draft which safety permitted for loading at Grays Harbor. She had 520 tons of water on board, leaving her water tanks more than half empty. Had she filled her tanks, some of the cargo would have had to be discharged. Emptying any of her tanks would have decreased her stability.

The claim that she was unseaworthy for crossing the bar when she broke ground is based upon the following evidence:

A bridge tender on the Northern Pacific bridge, 200 to 300 yards above the Dolphins, testified that on the morning of March 4th he noticed that the ship, while lying at the Dolphins, had a bad list, sometimes to port, at other times to starboard, and that her list became the subject of conversation among a group of men with him on the bridge. The master, mate, and engineer of the tug Tyee, which later assisted the Horaisan Maru through the harbor, gave similar testimony. Hansen, the local pilot who took the vessel through the harbor, testified that Clarkson, the inspector of the ship called him up that morning to come down to take a look at her, because she had quite a starboard list, and he thought she might be aground. He further testified that she took a seven degree list on casting off.

The engineer of the tug which assisted the Horaisan Maru testified that as soon as the lines were taken off and the tug went ahead, the ship took a sheer; that she handled with difficulty throughout the time that the tug was with her, hardly answering her helm; that she sheered several times and had great difficulty in getting through two bridges not far from the Dolphins; that during most of the time she had a starboard list, sometimes up to fifteen or twenty degrees; and that she sometimes rolled over to port. The master and mate of the tug testified to the same

effect, the former estimating the list as being at times fifteen degrees.

Observers at various points along the shore all corroborated this account of the vessel's behavior. A bridge tender on the O. & W. Railroad Bridge, under which she passed, described her list as "the worst I ever seen." A mechanic on a dock a short distance from the bridge testified that the men on her deck looked "like they were walking up hill." A water tender on a United States Eagle boat at the Port Commission Dock stated that he "wouldn't hesitate a moment about bucking" a ship in such condition. Captain Ahlman, master of a tug, who observed her negotiating one of the bridges, described her condition at the time as very dangerous and said she sheered several times and rolled from side to side.

The manager of the Grays Harbor Stevedoring Company, who was loading another ship, took a picture of the Horaisan Maru as she passed the Port Commission Dock. The petitioner's own expert calculated the list shown on the picture as about seven and one-half degrees. Claimant's expert estimated it at about thirteen degrees.

The captain of the Sujerseyco, which had crossed the bar about a half mile ahead of the Horaisan Maru, thought that the latter was tender, unstable, and had a dangerous list, estimating it at from ten to fifteen degrees. The chief engineer and a fireman on the Sujerseyco corroborated this testimony. A deck hand on a tug boat which was waiting outside the bar to take the local pilot off the Horaisan Maru noticed her list, and estimated it to be at least from seven to ten degrees.

Captain Spicer, a friend of Captain Clarkson, the inspector, testified that at a conversation in the captain's cabin on the morning of March 4th, at which Mr. Nakanishi, connected with the freight department of Mitsui & Co., was present, the inspector expressed some doubt about granting a certificate of seaworthiness on account of the vessel's list, and that he finally granted such certificate only upon the captain's promise to straighten her out before taking her out. Spicer testified that on leaving the ship the inspector met the local pilot and told him to be careful, and, if she was not in shape, not to take her out; that while the inspector and he were at lunch they were interrupted by the manager of the port of Grays Harbor who came to tell the inspector that a ship was going out with a very bad list; that the inspector suspected it was the Horaisan Maru and hurried to the Port Commission Dock, from which he hailed the pilot as the vessel passed

and told him to anchor down the bay unless the ship was straightened out; that he remarked to the person who snapped the picture mentioned above, who was on the dock at the time, "I told the sons of — to straighten her up before they took her out to sea."

Petitioner's witnesses testified that the vessel had a list of only two or three degrees most of the time, always to starboard until reaching Grays Harbor City, when it changed to port upon rubbing the right bank. Petitioner contends that the vessel's list down the harbor to the bar and the changes in her list were caused by her bilges rubbing the side of the narrow channel in the shallow water and by an error of the first assistant engineer who, it is testified, proceeded contrary to orders, to empty a ballast tank which increased the list, instead of one which would have decreased the list; and that the ship was steered so far south of the narrow channel over the bar that she struck the submerged bank south of the channel.

The evidence presents a conflict on practically every material fact. The inherent weakness of the explanations given by the petitioner, the probabilities, and the credibility of the witnesses as affected by their interest require that the conflict be resolved in favor of claimants.

In view of petitioner's assertion that a three degree list is hardly noticeable, it is remarkable that almost all of petitioner's witnesses noticed it, and more remarkable still that they did not hesitate to estimate it in degrees.

Petitioner seeks to account for the starboard list and the occasional increases in such list by attributing them to the fact that her bilges were rubbing the side of the channel. This explanation is hardly consistent with the undisputed increase in the list at the Standard Oil Dock, which is one of the deepest, if not the deepest part of the river, it being 60 or 70 feet in depth according to petitioner's own witnesses.

It is at about this point, too, that petitioner's witnesses testify that an order was given to shift coal from starboard to port. The contention that the list was merely a temporary one caused by rubbing the bank is inconsistent with such an order. The master of the Horaisan Maru admitted that he would not proceed thus to remedy a list caused only by the fact that the ship was riding on the port side of the channel.

The petitioner's contention that all was well with the ship is hardly consistent with its own evidence of the shifting of coal and ma-

nipulation of ballast tanks, admittedly undertaken to remedy the list. Shortly after leaving the Dolphins the chief engineer considered the list of sufficient importance to warrant his going up to speak to the captain about it. In connection with the ballast tank error, the mistaking of the dry tank, numerically third in order, for the fourth, actually known as No. 3 starboard tank, it may be noted that the chief engineer testified that the dry tank was never known as No. 3 tank.

The foreman in charge of the loading of the Horaisan Maru and petitioner's supercargo testified that the vessel had only a slight list on starting, although at one point down the river it increased to five degrees, according to one, and seven degrees, according to the other. Together these men watched her as she left the Dolphins and until she made the turn at the Standard Oil Dock. Thence they followed her course, watching her from several points on the river. Neither admits that this was caused by any concern on his part. In the absence of an adequate explanation, it must be inferred that there was something extraordinary about the vessel's behavior to warrant such procedure.

Of similar circumstantial value is the fact that the manager of the port considered the matter urgent enough to find and interrupt Clarkson at lunch. Clarkson's departure for the Port Dock emphasizes this, as does his strong language, noted above. The latter serves to corroborate Spicer's testimony as to Clarkson's conversation on the vessel in the morning, when he had issued the certificate of seaworthiness only on the master's promise to straighten out the ship.

■ The conclusion indicated derives strong support from the fact that almost all of petitioner's witnesses are officers and men of the ship, whose tendency to stick by the ship has been judicially noted. See The Benjamin Noble (D. C.) 232 F. 382, 394. Claimants' witnesses, on the other hand, are disinterested. No reason appears why they should be tempted to lie. The crew of the tug Tyee, besides having no interest, were in a particularly advantageous position to observe the Horaisan Maru, having accompanied her down the river to the Port Commission Dock. Men along the shores, on the bridges, on other tugs, on the Sujerseyco which preceded the Horaisan Maru over the bar did not have any reason not to tell the truth. So, too, Captain Spicer, who was with Clarkson when he boarded the vessel in the morning, later at lunch, and then on the trip to the Port Commission Dock.

■ Even if the evidence were evenly balanced, the petitioner must fail since it bears the burden of proof as to seaworthiness. The Wildcroft, 201 U. S. 378, 26 S. Ct. 467, 50 L. Ed. 794; The Colima (D. C.) 82 F. 665, 669.

Although the exact degree of her list cannot and need not be definitely fixed, it is clear that it was great enough to make the ship unseaworthy when she broke ground. Professor Jack, head of the School of Naval Architecture of the Massachusetts Institute of Technology, testified that a list of seven degrees renders a vessel unseaworthy, and that such a list has a very detrimental effect upon the steering of the ship. A similar opinion was given by Captain Stillwagon, a licensed pilot of New York Harbor for thirty-seven years. The list of the Horaisan Maru was at least seven degrees during most of the trip down the harbor, and the evidence shows that the vessel actually steered badly. Petitioner's own witness, Clarkson, said that he would not grant a certificate for crossing the bar where a vessel had more than a three degree list, or at most four or five degrees.

So, too, the fact that she rolled from side to side showed that she lacked initial stability, according to the opinion of petitioner's own expert.

Moreover, a list of seven degrees would increase her draft to more than 28 feet, and ten degrees to more than 29 feet. The maximum draft for loading at Grays Harbor was 26 feet 6 inches.

Petitioner's evidence directed to showing that there was a 38-foot depth prevailing on the bar at the time of stranding is insufficient to establish this. It is based upon a chart more than a month old. The government charts themselves warn that the depth of the water on the bar is subject to frequent change. The chart dated February 2, 1926, shows a minimum depth of 31 or 30 feet at mean low water. The one published just previous to this one, in November, 1925, shows a minimum depth of 37 feet. This further indicates the variability of the depth and unreliability of charts more than a month old.

Striking evidence that there was considerably less than 38 feet on the bar at the time is the fact that the Sujerseyco, a smaller vessel drawing only 23 feet 9 inches, which preceded the Horaisan Maru by a half mile, struck bottom in going over, though she was on the range line and well within the channel when this happened. The pilot testified that the Horaisan Maru was on the range line going through the channel.

Moreover, the testimony that 3 to 6 feet

under a ship's keel was a safe allowance is considerably weakened by the testimony of the inspector that some time before vessels had been striking frequently in crossing the bar, having only 4 or 5 feet under them, which was a very dangerous situation.

■ The conclusion is inevitable that the stranding resulted from the vessel's unseaworthiness, particularly her list and resulting excessive draft.

Even were the causal connection between the vessel's unseaworthiness and the stranding not established, there could be no exemption under the Harter Act (46 USCA §§ 190–195). International Navigation Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 226, 21 S. Ct. 591, 45 L. Ed. 830; The Willdomino (C. C. A.) 300 F. 5, affirmed 272 U. S. 718, 47 S. Ct. 261, 71 L. Ed. 491; Earle & Stoddart, Inc., v. Ellerman's Wilson Line, Ltd., 287 U. S. 420, 426, 53 S. Ct. 200, 77 L. Ed. 403; Compania General De Tabacos De Filipinas v. United States (C. C. A.) 49 F.(2d) 700, 701, 702; California & Hawaiian Sugar Refining Corp. v. Rideout (C. C. A.) 53 F. (2d) 322, 324; cf. Hartford & New York Transportation Co. v. Rogers & Hubbard Co. (C. C. A.) 47 F.(2d) 189, 192; May v. Hamburg-Amerikanische Packetfahrt Aktien-Gesellschaft (C. C. A.) 63 F.(2d) 248, 251; The Turret Crown (C. C. A.) 284 F. 439, 445.

■ Before arriving at Grays Harbor, the Horaisan Maru had taken on cargo at San Francisco, Seattle, Everett, and Vancouver. The petitioner contends that in any event it cannot be held liable for the loss of cargo loaded at these ports, since no claim of unseaworthiness at these ports is made. This contention cannot prevail. Although the general proposition that unseaworthiness arising after the vessel breaks ground does not deprive the shipowner of the benefit of the Harter Act is correct, this is entirely different from petitioner's contention, which would require the conclusion that when a vessel contemplates taking on cargo at several ports, her responsibility for the cargo loaded at the first port should be measured only by the capacity of the ship to carry it safely, notwithstanding the fact that the owner knows that more is to be loaded later and that whatever hazard is created by the additional loadings is shared by all the cargo, wherever loaded. In The Steel Navigator (C. C. A.) 23 F.(2d) 590, 592, the court averted to this, saying: "Especially is it necessary to remember that the measure of what can in any event be demanded of her is her fitness for the whole voyage as contemplated at the outset." And see The Viking (C. C. A.) 271 F. 801; The Willdomino (C. C. A.) 300 F. 5, 12, affirmed 272 U. S. 718, 47 S. Ct. 261, 71 L. Ed. 491.

■ Whether petitioner may limit its liability to the value of the vessel and her pending freight depends on whether there was unseaworthiness with its "privity or knowledge." Where the owner is a corporation, the privity or knowledge must be that of a managing officer or agent. Craig v. Continental Insurance Co. of N. Y., 141 U. S. 638, 12 S. Ct. 97, 35 L. Ed. 886; The Colima (D. C.) 82 F. 665. The test is the extent of the person's authority, not whether he is technically an officer. Boston Towboat Co. v. Darrow-Mann Co. (C. C. A.) 276 F. 778. It is sufficient if the person is "one to whom the corporation has committed the general management or general superintendence of the whole or a particular part of its business." The Erie Lighter 108. (D. C.) 250 F. 490, 494. This does not include the master of the ship. Craig v. Continental Insurance Co., 141 U. S. 638, 647, 12 S. Ct. 97, 35 L. Ed. 886; Quinlan v. Pew (C. C. A.) 56 F. 111, 117; The Colima, supra.

■ Claimants contend that the presence of Nakanishi, of petitioner's freight department, at the conversation concerning the list, which took place between the inspector and the master on the morning of March 4th, constitutes "privity and knowledge" on the part of the petitioner. Although it is by no means clear that Nakanishi's presence at this conversation would be sufficient to charge him with knowledge of the unseaworthiness, even assuming that it were, the present record shows that Nakanishi did not occupy a position of sufficient authority in Mitsui & Co. to warrant the imputation of his knowledge to the petitioner. Although his testimony in the case at bar, showing his very limited authority, is somewhat impaired by his testimony in another case involving the wreck of the Horaisan Maru, it is corroborated by Shibagaki, manager of petitioner's Seattle office, and there is no evidence to show an authority as wide as that required by the cases cited. The court, therefore, finds that the vessel's unseaworthiness was without petitioner's privity or knowledge.

Exemption from liability accordingly is denied, and limitation of liability granted.